UNITED STATES of America,
Plaintiff–Appellee,

v.

Allen Royce WEATHERSPOON,
Defendant–Appellant.

No. 95–5343.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 4, 1995.

Decided April 29, 1996.

Tony R. Arvin, Asst. U.S. Attorney (argued and briefed), Memphis, TN, for Plaintiff–Appellee.

Stephen Farese (argued and briefed), Farese, Farese & Farese, Ashland, MS, for Defendant–Appellant.

Before: JONES, NELSON, and NORRIS, Circuit Judges.

The court delivered a PER CURIAM opinion. JONES, J. (pp. 699–700), delivered a separate concurring opinion.

PER CURIAM.

If, after police officers have made a lawful stop of a motor vehicle, one of the officers looks through the car's windshield and sees the barrel of a gun that the driver has just placed under the front seat, may the weapon be seized without a warrant? The district court concluded that this question should be answered "yes." We agree.

I

Shortly before midnight on August 17, 1993, the defendant, Alan Royce Weatherspoon, was driving a 1984 Oldsmobile on a public thoroughfare in a residential neighborhood in Shelby County, Tennessee. Officers John Mills and Scott Wright, of the Shelby County Sheriff's Department, drove past the vehicle in the opposite direction. Officer Mills looked in his rear view mirror, he later testified, and noticed that Mr. Weatherspoon's left tail light was not working. The

officer testified that he then made a U-turn, stopped the Oldsmobile, and asked Mr. Weatherspoon to step over to the squad car.

Mr. Weatherspoon did as instructed, after locking his car keys inside the Oldsmobile. While Officer Mills was checking Weatherspoon's driver's license and speaking to him about the tail light, Officer Wright walked up to the Oldsmobile and looked through its windshield with the aid of a flashlight. He did so, according to his testimony, because he had seen the driver reaching down for the floorboard as he was pulled over.

Officer Wright saw the barrel of a pistol sticking out from under the seat. Mr. Weatherspoon was then handcuffed, placed in the squad car, and read his *Miranda* rights. Officer Wright went back to the Oldsmobile to see if he could get inside.

The door of the Oldsmobile was eventually unlocked somehow, and Officer Wright reached down to get the pistol. As he did so, he testified, he saw another pistol lying on top of the one seen earlier. He seized both weapons, one of which was subsequently described as a "S[mith] & W[esson] 357 6 shot (live)," and the other as a "32 cal ... 7 shot (live)."

Officer Mills testified that he asked Mr. Weatherspoon why he had the weapons. Weatherspoon responded that someone had stolen the fender skirts from the rear of his car, and he "was out driving around looking for him."

Mr. Weatherspoon's papers were in order, he had no outstanding warrants, and his car had not been reported stolen. He was therefore released (after a warning about the tail light) with a "misdemeanor citation in lieu of arrest." The citation charged him with "Unlaw[ful] Poss[ession] of Weapon" in violation of Tenn.Code Ann. 39–17–1307. (This statute makes it a misdemeanor to carry a firearm "with intent to go armed.") The citation directed Mr. Weatherspoon to appear at the Sheriff's Department for processing on September 2, 1993, and at the General Sessions Court for a hearing on the indicated charge one week later. The officers retained the loaded pistols.

At the time the citation was issued, the officers did not know that Mr. Weatherspoon was a convicted felon. In 1979, however, he had in fact been convicted of robbery with a deadly weapon and assault with intent to commit voluntary manslaughter by means of a pistol. In 1986 he had been convicted of robbery with a deadly weapon. On August 26, 1993, these convictions having come to light, a federal grand jury indicted Mr. Weatherspoon on two counts of being a convicted felon in possession of a firearm shipped in interstate commerce. See 18 U.S.C. § 922.

Mr. Weatherspoon moved for suppression of all evidence arising out of his August 17 arrest, raising issues as to the constitutionality of the stop, the search of the automobile, and the seizure of the two loaded pistols. After an evidentiary hearing and full briefing, the district court (Horton, J.) denied the motion to suppress. In accordance with Rule 11(a), Fed.R.Crim.P., Mr. Weatherspoon then entered a conditional plea of guilty to one count of the indictment, reserving the right to appeal the adverse ruling on his motion to suppress evidence. The other count of the indictment was dismissed on motion of the government. On February 28, 1995, Mr. Weatherspoon was adjudged guilty and sentenced to imprisonment for a term of 57 months. A timely appeal followed.

## II

Mr. Weatherspoon contended at the suppression hearing that the officers stopped him on a pretext. There was nothing wrong with either of his tail lights, he testified, and other evidence was offered to corroborate this testimony. The police officers insisted that the tail light was not working, and they testified that it was still not working some three days later, when they stopped Mr. Weatherspoon again.

After weighing the credibility of the witnesses, the district court found as a fact that the tail light had not been working on the night of August 17. Our court is bound by that finding unless we consider it clearly erroneous. At the argument of the appeal, counsel for Mr. Weatherspoon conceded— properly, in our view—that this court would

have no basis for rejecting the district court's finding as clearly erroneous. That being so, it is clear as a matter of law that the traffic stop was justified. See *United States v. Ferguson*, 8 F.3d 385 (6th Cir.1993) (*en banc*), *cert. denied*, —— U.S. ——, 115 S.Ct. 97, 130 L.Ed.2d 47 (1994).

■ Defense counsel does not concede that Officer Wright was justified in looking through the windshield of the Oldsmobile after Mr. Weatherspoon had parked and locked the vehicle. But the decision of the United States Supreme Court in *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), teaches that it was not unconstitutional for the officer to look inside. As the plurality said in *Brown*,

> "The general public could peer into the interior of Brown's automobile from any of numerous angles; there is no reason [the officer] should be precluded from observing as an officer what would be entirely visible to him as a private citizen. There is no legitimate expectation of privacy." *Id.* at 740, 103 S.Ct. at 1542.

The fact that the officer used a flashlight is immaterial. *Id.*

■ Once the officer saw the barrel of a gun sticking out from under the seat, and given Mr. Weatherspoon's explanation of why it was there, it was not unreasonable for the officer to seize the weapon without a warrant. Officer Wright testified without contradiction that the gun barrel was in plain view. Whether or not its discovery was inadvertent, "the warrantless seizure of evidence of crime in plain view is [not] prohibited by the Fourth Amendment...." *Horton v. California*, 496 U.S. 128, 130, 110 S.Ct. 2301, 2304, 110 L.Ed.2d 112 (1990).

Was the weapon that Officer Wright saw evidence of a crime? *Horton* suggests that the weapon would not have been subject to warrantless seizure under the "plain-view" doctrine unless its incriminating character was "immediately apparent." *Id.* at 136, 110 S.Ct. at 2307–08. The fact that Mr. Weatherspoon was seen reaching down to the floor in the course of the traffic stop may well have suggested guilty knowledge sufficient to justify the seizure, but we need not rest our

decision on that proposition. At the very least, it was reasonable to ask Mr. Weatherspoon why he had the gun—and his answer to that question left no room for doubt that the gun was evidence of a misdemeanor, if nothing more.

The reason he was armed, according to Mr. Weatherspoon, was that he was looking for someone who had stolen his fender skirts. But it is Memphis we are talking about here, not Dodge City. The people of Tennessee do not want men bent on settling their grievances roaming the streets of residential neighborhoods with knives, clubs, or pistols. That is why the legislature enacted Tenn. Code Ann. 39–17–1307, making it an offense to carry a knife with a blade exceeding four inches in length, a club, or a firearm, "with the intent to go armed." It was eminently reasonable for the officers to cite Mr. Weatherspoon for a violation of Tenn.Code Ann. 39–17–1307, and it was eminently reasonable for them to confiscate his loaded pistols before sending him on his way.

**AFFIRMED.**

NATHANIEL R. JONES, Circuit Judge, concurring.

After examining the merits of this appeal, I find no quarrel with the result reached by the majority in this case. Yet I am troubled by the utter lack of professionalism on the part of the officers in this case. It is clear from the facts that the officers employed every conceivable method to gain access to Weatherspoon's car. They could have better spent their time, however, obtaining a search warrant. The fact that they ignored this option is what troubles me the most.

The Supreme Court has long held that "[a]s a general rule, [the Fourth Amendment] has required the judgment of a magistrate on the probable-cause issue and the issuance of a warrant before a search is made." *Chambers v. Maroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970). It follows that in cases involving automobile searches, "[a]rguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion [of immo-

bilization] is permissible until the magistrate authorizes the 'greater' [intrusion of a search]." *Id.* Therefore, the various Fourth Amendment exceptions notwithstanding, *Chambers* teaches us that if it is possible to obtain a warrant, then the government should make every effort to do so. *Id.*

The officers' disregard of that lesson indicates that they viewed the rule favoring warrants as the exception. The facts of this case demonstrate that it is not likely that Weatherspoon or anyone else could have moved the car or disposed of the incriminating evidence inside the car during the time that it would have taken the deputies to get a search warrant. The car was totally immobile because the keys were locked inside it, and entrance into the passenger cabin was impossible. The officers spent an inordinate amount of time searching for ways to get into the car, when they could have spent that time attempting to obtain a warrant. The fact that their conduct is justified under "plain view" exception, *see Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (cited in Maj. Op. at 699), makes it no less disturbing.

The courts have established certain exceptions to the mandate of the Fourth Amendment in cases involving automobiles, and rightfully so. Those engaged in the enforcement of laws, however, should be reluctant to invoke those exceptions when there exists a legitimate opportunity to secure a warrant; likewise, the reviewing courts should be reluctant to uphold such decisions. In future cases, this court would do well to remember the words of Justice Bradley in *Boyd v. United States,* 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886) [1]:

> It may be that [the search] is the most obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure.... It is the duty of courts to be watchful for the constitutional rights of

the citizen, and against any stealthy encroachments thereon.

---

1. *Quoted in Coolidge v. New Hampshire,* 403 U.S. 443, 454, 91 S.Ct. 2022, 2031, 29 L.Ed.2d 564 (1971).