**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Anthony E. BRADSHAW, Defendant–Appellant.**

**No. 94–6487.**

United States Court of Appeals, Sixth Circuit.

Argued June 7, 1996.

Decided Dec. 6, 1996.

ROSEN, District Judge.

In this case we decide whether Appellant's motion to suppress evidence that was obtained after he was stopped for driving with an altered temporary vehicle license tag should have been granted. The District Court denied the motion, and we now AFFIRM.

## I. *FACTUAL BACKGROUND*

During a routine traffic patrol on October 19, 1991, Memphis police officer Martin Kula ("Officer Kula") came up behind Defendant–Appellant Anthony E. Bradshaw's ("Appellant's") vehicle, while both vehicles were travelling in the same direction on a street in Memphis. Subsequently, Officer Kula stopped directly behind Appellant's vehicle at two intersections. During these stops, Officer Kula observed an altered temporary license certificate or "drive-out" tag in the rear window of Appellant's car. In particular, he noticed two different prints on the drive-out tag, one in ink and the other in felt marker. Officer Kula then put on his police lights and siren and pulled Appellant over to check the drive-out tag. As Officer Kula approached Appellant's vehicle, he observed the drive-out tag more closely and confirmed that it had indeed been altered, specifically the dates and the information concerning the issuer had been changed.

While Officer Kula was inspecting the drive-out tag, Appellant exited his vehicle and approached him. Officer Kula testified that Appellant was acting "nervous" and "jittery" and had actually begun to sweat. At that point, Officer Kula asked Appellant to take a seat in the back of his police car. Officer Kula testified that asking Appellant to sit in his police car under these circumstances was merely a routine matter of proper police procedure.

After Appellant was seated in the back of Officer Kula's police car, Officer Kula performed radio checks on Appellant's driver's license and vehicle certification. He also issued a citation for the altered drive-out tag— a violation of vehicle registration and inspection laws. Performing the radio checks and issuing the citation took approximately 20 minutes.

During this time, Officer Tim Cooper ("Officer Cooper"), who was also out on a routine patrol, stopped at the scene, exited his vehicle, and approached Officer Kula's car.[1] While Officer Kula was performing the radio checks and issuing the citation, Officer Cooper walked to Appellant's car and looked in the passenger side window to determine if there were other people in the vehicle or if there were weapons or alcohol laying on the seat. From this vantage point, he saw a small plastic bag which appeared to contain marijuana. As he reached for the plastic bag, Officer Cooper noticed the handle of a .357 magnum sticking out from under the driver's seat. Officer Cooper took the bag and the gun and returned to Officer Kula's

---

* The Honorable Gerald E. Rosen, United States District Court Judge for the Eastern District of Michigan, sitting by designation.

**1.** Officer Cooper was in this vicinity and had observed Officer Kula's pulling Appellant over because Officer Cooper and Officer Kula had just jointly arrested another person a short distance from where Officer Kula had stopped Appellant.

vehicle. Shortly thereafter, the officers arrested Appellant because of the suspicious plastic bag[2] and the gun. As Appellant remained in the squad car, the officers told him to place his hands on the screen of the squad car while they went to inventory Appellant's vehicle.

Next, the officers proceeded to search Appellant incident to his arrest. As Officer Kula patted down Appellant, he felt a "hard spot" near the groin area of Appellant's pants. Then, while Officer Kula was handcuffing Appellant, Appellant broke free and tried to run from the officers. During his attempted flight, the officers observed Appellant reach into his pants and discard two pill bottles. The officers eventually apprehended, handcuffed, and returned Appellant to Officer Kula's police car. The officers then recovered the two Tylenol pill bottles that Appellant had thrown; together these bottles contained thirty "rocks" of crack cocaine.[3] After a thorough search of Appellant's vehicle, including its trunk, the officers found $440, more marijuana, and an additional handgun.

Both Officers testified to the above matters at an initial suppression hearing presided over by Magistrate Judge Aaron Brown, Jr. (the "Magistrate"). The Magistrate granted Appellant's motion to suppress, reasoning that Officer Kula lacked credibility as a witness because of inconsistencies in his testimony regarding the timing and location of and lighting conditions at the stop. Specifically, the Magistrate found, based on Officer Cooper's testimony[4], that it was likely too dark for Officer Kula to have seen the altered drive-out tag.

The Magistrate's ruling was subsequently overturned by the District Court after it held its own hearing devoted solely to resolving the issue of whether Officer Kula saw the altered drive-out tag before he made the stop. Despite some contradictions in the testimony of Officers Kula and Cooper regarding the precise time and location of the stop and their descriptions of the lighting conditions that evening, the District Court concluded that Officer Kula had seen the altered drive-out tag before Appellant was stopped, and that his earlier credibility problems were the result of his misunderstanding certain questions.

During the initial hearing before the Magistrate, Officer Kula testified that "it was light out" when he stopped Appellant's car, whereas Officer Cooper testified that it was dark when Appellant's vehicle was stopped. Before the District Court, Officer Kula testified it was still daylight, but was getting darker. Further, Officer Kula also said there were other light sources which illuminated Appellant's vehicle. Meanwhile, Officer Cooper likewise noted there were other light sources, but testified that it was "dark as far as the sun goes."

Similarly, the officers differed in their accounts of what time Appellant's vehicle was stopped. Officer Kula testified initially that the stop took place at 7:30 p.m. Before the District Court, he testified that the stop took place at 6:55 p.m. Officer Kula said he was certain of this time after consulting the traffic citation which was issued at 7:15 p.m, figuring that Appellant was stopped approximately twenty minutes before the citation was issued.

The location of the stop was another point on which the officers' testimony was in some conflict. Officer Kula testified that he simply ended up behind Appellant heading westbound on Court Street. He further testified that Appellant stopped twice at stop signs, and that he was located directly behind Appellant's vehicle at both of these stops. On the other hand, Officer Cooper's testimony indicates that Appellant was observed travelling northbound on Claybrook while the officers were travelling west on Court Street.

---

2. Tests later confirmed that the plastic bag did indeed contain marijuana.

3. At trial, Appellant admitted to possession of the crack cocaine, although he claimed it was for his personal use. He also admitted ownership of the gun found in the passenger compartment of his vehicle.

4. Officer Cooper testified at this initial suppression hearing that it was dark at the time that Officer Kula was observing Appellant's drive-out tag.

Similarly, the arrest ticket also states Appellant was travelling northbound on Claybrook.[5]

When it reversed the Magistrate's ruling on the motion to suppress, the District Court addressed these discrepancies in the officers' testimony. The Court found that, despite some initial confusion concerning questions about time and place, Officer Kula's testimony as to what he saw when he pulled over Appellant corroborated his earlier testimony. Further, it concluded that light coming from nearby church and medical center parking lots would have been sufficient to illuminate the area where Appellant was stopped. Accordingly, the Court ruled that Officer Kula did see the altered drive-out tag; and, as a result, that the circumstances justified the initial detention of Appellant and the plain view search of his car.

In the time following his arrest, but preceding the suppression hearing, Appellant was a fugitive, having failed to appear at his pre-trial conference. Eventually, with some difficulty, officers with the Trident Task Force [6] located Appellant after receiving information that he was at a particular apartment. When the Task Force officers arrived at this apartment, they went to the front door, knocked, and identified themselves. One of them, Officer Rush, also "peeped" through a mail slot in the front door, which enabled him to observe an African–American male enter a bathroom which was at the top of a flight of stairs that was directly in front of the door. Eventually, a woman opened the door and let the officers in after they had identified themselves and stated the purpose of their visit. Although the officers searched the apartment twice thoroughly, they could not find Appellant. However, Officer Rush decided to search the bathroom one more time. During this search, he opened the medicine cabinet in the bathroom and observed that the bathroom wall behind the medicine cabinet had been punched through into the adjoining apartment.

At this time, Officer Rush yelled to his fellow officers that Appellant was next door. As Officer Rush and the other officers were running to the next-door apartment, they encountered a woman running from this apartment, who told them that Appellant was indeed in that apartment. The officers entered the next-door apartment through its open front door and found Appellant a few feet from the front door. The officers immediately seized and arrested Appellant.

The residents of the next-door apartment later explained to the officers how Appellant came to be in their apartment. Specifically, they stated that Appellant had crawled into their apartment through the aforementioned hole in the bathroom wall and, once in their apartment, that he had held a knife to the throat of one of the occupants and ordered the others to be quiet. Appellant denies ever having a knife or threatening anyone.

## II. PROCEDURAL HISTORY

On November 5, 1991, Appellant was indicted by a Federal Grand Jury and charged with two counts: (1) possession with intent to distribute cocaine base, 18 U.S.C. § 841, and (2) carrying and use of a firearm in relation to a drug-trafficking crime, 18 U.S.C. § 924(c). Appellant failed to appear for arraignment on December 11, 1991, and his bond was revoked. He was eventually arrested and made his initial appearance on September 8, 1993, before the Magistrate. On September 24, 1993, Appellant filed a Motion to Suppress Evidence, claiming that the cocaine and firearms were obtained during an illegal search and seizure in violation of the Fourth Amendment.

On October 8, 1993, a Superseding Indictment was returned against Appellant charging: (1) unlawful possession with intent to distribute of cocaine base, 18 U.S.C. § 841; (2) carrying and use of a firearm during and in relation to a drug-trafficking crime, 18 U.S.C. § 924(c); (3) being a convicted felon in possession of a firearm, Armed Career Criminal Act, 18 U.S.C. § 924(e); and (4)

---

5. Appellant does not take exception to Officer Kula's statement that he did in fact follow directly behind Appellant before making the traffic stop.

6. These officers, affiliated with the U.S. Marshals, are responsible for locating fugitives.

violating the Bail Reform Act, 18 U.S.C. § 3146.

Thereafter, on November 8, 1993, Appellant filed an Amended Motion to Suppress Evidence. The Magistrate conducted an evidentiary hearing on the motion that same day. In a Report and Recommendation issued on November 19, 1993, the Magistrate recommended that the Motion to Suppress be granted. The United States filed Objections to the Magistrate's Report, and the District Court, on December 28, 1993, held an additional hearing to consider Appellant's Motion to Suppress. Two days later, the District Court ordered that the motion be denied. The District Court later denied Appellant's Motion to Reconsider.

Following a jury trial, Appellant was convicted on the two additional counts alleged in the Superseding Indictment: being a convicted felon in possession of a firearm, Armed Career Criminal Act, 18 U.S.C. § 924(e) and violating the Bail Reform Act, 18 U.S.C. § 3146. The jury, however, was unable to reach a verdict on the original two counts. Subsequently, the District Court sentenced Appellant to 300 months imprisonment for the § 924(e) charge and 27 consecutive months as to the § 3146 charge. Thus, Appellant's total sentence was 327 months of imprisonment followed by a three-year term of supervised release. Thereupon, Appellant filed this appeal.

### III. ISSUES ON APPEAL

Appellant asserts that there are four issues on appeal. First, Appellant contends that the District Court erred in finding that the police had reasonable suspicion to make an investigative stop of his vehicle. He argues that given the lighting conditions on the evening of October 19, 1991, and the inconsistencies in the testimony of the arresting offi-

cers, the District Court's findings amount to clear error.

Second, Appellant contends that the District Court erred in refusing to suppress the marijuana and the handgun found in the passenger compartment of his car. He argues that the search and seizure were invalid, notwithstanding the plain view doctrine, because the marijuana and the gun were the fruit of an illegal stop and seizure.

Third, Appellant argues that the District Court erred in refusing to suppress the crack cocaine that he tossed away as he fled from the police. The District Court found the seizure justifiable, but again, Appellant urges that this evidence was tainted by the allegedly illegal stop, seizure, and subsequent arrest.

Finally, Appellant contends that the District Court erred in computing Appellant's sentence. Here, he argues that his sentence should have been reduced for accepting responsibility for his actions pursuant to the United States Sentencing Guidelines. We address each issue seriatim.

### IV. ANALYSIS

#### A. The Standards Governing This Appeal.

In reviewing the District Court's ruling on a motion to suppress evidence, this Court applies the clearly erroneous standard to findings of fact, while reviewing conclusions of law *de novo*. *United States v. Dotson*, 49 F.3d 227, 229–230 (6th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 141, 133 L.Ed.2d 87 (1995); *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir.1993).

#### B. The Initial Traffic Stop Was Properly Supported by Probable Cause.

Appellant argues that the actions of Officers Kula and Cooper were unlawful because the officers did not have a reasonable suspicion to justify an investigatory stop.[7] Appel-

---

7. Following oral argument, Appellant urged the Court to consider *United States v. Caicedo*, 85 F.3d 1184 (6th Cir.1996), which he argued may have some bearing on whether there was a reasonable suspicion for Appellant's stop and the subsequent plain view search. *Caicedo*, however, addressed the issue of whether a person's outward appearance revealing some conscious

evidence of guilt provides the necessary probable cause to detain that person before the officers have a separate basis for probable cause, such as a traffic violation. Thus, *Caicedo* is not relevant to the instant matter because the District Court made a factual finding that Appellant had violated vehicle registration and inspection laws, thereby giving Officer Kula the right to pull Ap-

lant claims the inconsistencies in the testimony of the two officers, combined with Officer Kula's allegedly disingenuous testimony, indicate that there was no reasonable suspicion for the stop. In particular, Appellant points to the discrepancies in the officer's testimony regarding the lighting, timing, and location of the stop. Further, Appellant claims that the writing on the drive-out tag was too small to have been observed by Officer Kula. The Government contends that the findings of the District Court were fully supported by the evidence.

In finding that Officer Kula did see the altered drive-out tag, the District Court addressed only the question of lighting.[8] The District Court stated that the discrepancies regarding the lighting conditions were likely the result of misunderstood questions at the initial hearing.[9] The District Court also noted that there was artificial lighting present at the point of the stop, and that Officer Kula's actions following the stop corroborate the claim that he observed the altered drive-out tag from his car.[10]

■ The District Court's findings of fact should be upheld because they are not clearly erroneous. The Court accepted the testimony of the two officers and also articulated

plausible explanations for any apparent inconsistencies in the testimony concerning the lighting conditions. The Court also implicitly found that any other factors, such as the exact time or location of the stop, were not relevant because they did not affect Officer Kula's ability to view the drive-out tag from his car.[11] Because the District Court was in the best position to judge credibility, and because that Court plausibly resolved the discrepancies in the testimony, its findings of fact should not be disturbed.

■ In light of these factual findings, it is clear that the initial stop of Appellant's vehicle was proper. This Court has held that "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson,* 8 F.3d 385, 391 (6th Cir.1993). The probable cause determination turns on "what the officer knew *at the time he made the stop." Id.* at 391·(*emphasis* in original). Under *Ferguson,* the focus in traffic stop cases is "whether this particular officer in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the *only basis* or merely one basis for the stop." 8 F.3d at 391 (emphasis added).[12]

---

pellant over and detain him. Appellant's nervous and jittery behavior, raising safety concerns for Officer Kula, was merely an additional factor justifying the detention in the squad car.

8. The District Court additionally found, as a matter of law, that Officer Kula's ability to view the tag provided reasonable suspicion for the stop.

9. The District Court stated that the testimony of the two officers was not necessarily in conflict. Even if the testimony did conflict, the District Court found that the conflict did not raise doubts as to Officer Kula's credibility.

10. Following the stop, Officer Kula approached Appellant's car and viewed the drive-out tag. He then proceeded to issue a citation to Appellant.

11. In particular, the location of the stop does not really bear upon whether Officer Kula viewed the drive-out tag. It is undisputed that Officer Kula directly followed behind Appellant's car for some · time before pulling him over. Whether Kula noticed Appellant's car while on a street different than the one Appellant was travelling does not affect this point.

12. Indeed, the U.S. Supreme Court has recently gone even farther in *Whren v. United States,* —— U.S. ——, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), in which it held that when a police officer makes a routine traffic stop, it does not matter what the officer's motive was, or whether an objectively reasonable officer would have acted differently, so long as the officer had probable cause to believe that a traffic violation had occurred. —— U.S. at —— – ——, 116 S.Ct. at 1774–75.

Thus, because Appellant does not argue explicitly that Officer Kula's stop was pretextual, *Ferguson* and *Whren* control *a fortiori,* given that the District Court found, and we have affirmed, that Officer Kula did see the altered drive-out tag and that he subsequently pulled Appellant over, pursuant to probable cause, as a consequence of Appellant's violation of the vehicle registration and inspection laws. Appellant also seems to argue that instead of being pretextual, Officer Kula's relying on the altered drive-out tag was a post-hoc justification for the stop. This argument, however, is also foreclosed by the District Court's finding, which we have now affirmed, that Officer Kula did have probable cause for the stop due to his prior observation that Appellant's drive-out tag was altered.

■ In the instant matter, the District Court found, and we have now affirmed, that Officer Kula did in fact view the altered drive-out tag from his vehicle before he stopped Appellant. Thus, Officer Kula's view of the altered drive-out tag provided probable cause for stopping Appellant's vehicle pursuant to a traffic violation. Consequently, the stop, the subsequent detention in the squad car, the plain view search of Appellant's vehicle, and the resulting arrest were all lawful and well within *Ferguson.*[13]

## C. Placing Appellant in The Police Car and Performing a Plain View Search of His Vehicle Fell Within The Scope of a Traffic Stop.

The U.S. Supreme Court has articulated two requirements for a valid plain view search: (1) the incriminating nature of the item in plain view must be "immediately apparent," and (2) the officer must be lawfully located in a position from which he or she can plainly see the item and have lawful access to it. *Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112 (1990). The officer need not come across the seized item inadvertently. *Id.* at 130–31, 110 S.Ct. at 2304–05. Additionally, in a plurality opinion, the Supreme Court has stated that a motorist has "no

legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." *Texas v. Brown,* 460 U.S. 730, 740, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983) (citations omitted).

The District Court held that Officer Cooper satisfied the *Horton* requirements with respect to both the marijuana and the handgun found in the passenger compartment of Appellant's vehicle. Therefore, the Court concluded that the seizure of the marijuana and the handgun were valid plain view seizures.[14]

Appellant asserts only one challenge to the plain view search of his vehicle. He claims that his detention in the police car amounted to an arrest without probable cause, and that Officer Cooper, therefore, did not lawfully arrive at a position from which the items in Appellant's car could be viewed lawfully.[15] He believes the confiscated items are fruits of an unlawful arrest and should be excluded. The Government argues that a person detained in a police car is not necessarily arrested for Fourth Amendment purposes.

■ Detention in a police car does not automatically constitute an arrest. *See e.g.,*

**13.** Both sides cite *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in addressing whether the stop was a valid investigatory stop. *Ferguson,* however, is more on point because it specifically defines a test for traffic stop situations. Nevertheless, the result in this case would be no different if the initial stop were to be analyzed under the less-stringent *Terry* "reasonable suspicion" standard. Moreover, a *Ferguson* stop and a *Terry* stop are certainly analogous since both are legitimate detentions that do not rise to the level of an arrest.

**14.** Based on his testimony, the District Court found that Officer Cooper viewed the marijuana while looking in the front passenger side window. This view justified the seizure of the marijuana. Thus, the District Court further found that Officer Cooper was lawfully located within the car (to seize the marijuana) when he noticed the handgun sticking out from under the driver's seat. This plain view made the seizure of the handgun lawful.

**15.** It is unclear whether Appellant includes in his challenge to the validity of the plain view search the argument that during the search he was outside his vehicle and being detained in Officer

Kula's car. However, this argument too would be unavailing as this Court has ruled previously that a plain view search during a protective detention does not violate the Fourth Amendment. In *United States v. Weatherspoon,* 82 F.3d 697 (6th Cir.1996), on facts very similar to the present case, we held that a police officer could peer inside a vehicle if it were possible for a member of the general public to do the same, regardless of whether the defendant was inside or outside the car. In *Weatherspoon,* an officer defendant stopped the defendant for having a faulty tail light and thereupon asked the defendant to exit his vehicle and step over to his squad car. During this brief detention where the defendant was outside his car, the officer, using a flashlight, saw the barrel of a gun sticking out from under the driver's seat, and the defendant was arrested. 82 F.3d at 699. This Court concluded that if an officer legitimately saw the barrel of a gun sticking out from under the seat of a lawfully stopped vehicle, he could seize the gun without a warrant. *Id.* The fact that the defendant was outside his vehicle was not relevant to the Court's inquiry. *Id.* at 699–700.

*United States v. Parr*, 843 F.2d 1228, 1230 (9th Cir.1988) (finding no per se rule that detention in a police car is tantamount to an arrest); *United States v. Thompson*, 597 F.2d 187, 189–90 (9th Cir.1979) (motorist's committing traffic infractions and his inability to produce identification at the subsequent traffic stop justified his detention in a police car while an identification search took place) [16]; *United States v. Rodriguez*, 831 F.2d 162, 166 (7th Cir.1987) (detention in patrol car for several minutes is merely a normal part of police procedure for identifying delinquent drivers and does not constitute a custodial arrest).[17]

Nevertheless, it is true that detention in a police car may rise to the level of an arrest under some circumstances. For example, in *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir.1995), we found that a motorist could not be lawfully detained in a police car once the purposes of the initial traffic stop were completed.[18]

■ Thus, the question becomes whether this detention [19] exceeded the purpose and objective of the stop. We find it did not. Officer Kula began to write a traffic citation when the radio checks came back negative.

It was during this time that Officer Cooper discovered the marijuana and the handgun, thereafter presenting them both to Officer Kula. Based upon these facts, the initial detention of Appellant in the police car clearly did not exceed the scope of the traffic stop. Officer Kula could lawfully detain Appellant until he finished performing the radio checks and issuing the citation; this would be well within the bounds of the initial stop.

■ When the marijuana and the handgun were found in the vehicle passenger compartment and brought to Officer Kula's attention during Appellant's initial detention in the squad car, this clearly provided probable cause for further detention and the resulting arrest. Therefore, *Mesa*'s requirement that some additional suspicious activity is necessary to justify further detention beyond the scope of the original stop is met here.

In sum, because Appellant's detention in Officer Kula's police car was a legitimate exercise of valid routine police procedure, and because he was not detained for a period of time exceeding the purposes of the initial stop, all evidence in plain view within Appellant's car was lawfully seized.

16. Appellant argues that factual distinctions undermine the relevance of this case. He contends that he did not fail to provide identification, and that *Thompson* therefore is not instructive here. However, Appellant's driving a vehicle with an altered drive-out tag clearly does raise an issue of insufficient—indeed fraudulent—identification. Moreover, Appellant's exiting his vehicle and approaching Officer Kula in a "nervous" and "jittery" manner certainly provides a further basis for detention—*i.e.*, safety concerns.

17. Appellant believes that this case is not applicable because, unlike *Rodriguez*, the officers here possessed no information suggesting that Appellant might leave the area. Appellant, however, has misread *Rodriguez*. In *Rodriguez*, the Drug Enforcement Agency ("DEA"), suspecting that Rodriguez was a member of a drug conspiracy and believing that he might be leaving the area, asked the state police to stop Rodriguez's car briefly to check his identification. Thus, pursuant to the DEA request and this collective information about Rodriguez, the state police stopped Rodriguez's car to check his identification. The information relating to possible flight was not used to uphold Rodriguez's subsequent detention in the police car, however, because it was normal traffic police procedure to seat an individual in a squad car while his identity was determined.

*Rodriguez*, 831 F.2d at 166. Therefore, *Rodriguez* is still instructive.

18. At the very most, *Mesa* stands for the proposition that some activity must occur during the initial stop which raises reasonable suspicion in order to justify further detention that is unrelated to the initial traffic stop. *Mesa* does not require that reasonable suspicion be present "up-front" for an officer to detain a motorist in his squad car while conducting a records search that is related to the traffic violation for which the motorist was stopped. It should be noted that the *Mesa* Court did not seem to find detention in a police car to be problematic *per se*. Rather, it was problematic to *prolong* detention in a police car.

19. Here, Appellant was detained in the squad car for 2 reasons: (1) Officer Kula was performing radio checks on him and issuing him a citation and (2) Appellant's "nervous" and "jittery" demeanor raised safety concerns for Officer Kula. Indeed, Officer Kula testified that in such circumstances, seating the person in a squad car is a matter of routine police procedure. We do not believe it is appropriate for us, in the quietude of our chambers, to second-guess standard police procedure and this on-the-scene judgment.

## D. *Seizure of The Crack Cocaine.*

Having found that: (1) Appellant was lawfully stopped; (2) Appellant was lawfully detained in the police car; and (3) Officer Cooper's plain view search was valid, it follows that the subsequent arrest and search of Appellant were also valid.[20]

■ It is well-settled that law enforcement officers are permitted to search an arrestee's person incident to an arrest. *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 476–77, 38 L.Ed.2d 427 (1973); *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). In this instance, the search of Appellant revealed a hard substance located near the groin area of Appellant's pants. Before the officers could handcuff Appellant and determine what the object was, Appellant fled, and while fleeing, discarded the pill bottles. Appellant's unlawful flight does not allow him to "abandon" that which the officers would have otherwise lawfully seized from him. *United States v. McLaughlin,* 525 F.2d 517, 519–20 (9th Cir. 1975) (seizure of abandoned marijuana lawful where defendant threw it from his truck while fleeing drug enforcement officers); *United States v. Wider,* 951 F.2d 1283, 1286 (D.C.Cir.1991) (search of bag containing cocaine rocks lawful where the appellant abandoned the bag by leaving it behind in a public place). *See also, California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 1551–52, 113 L.Ed.2d 690 (1991) (seizure of abandoned cocaine rock lawful where the defendant disposed of it while fleeing from police on foot). Therefore, the subsequent seizure of the discarded pill bottles containing crack cocaine was permissible.

## E. *Acceptance of Responsibility.*

Lastly, we turn to Appellant's argument that he is entitled to a two point reduction in his federal criminal sentencing guidelines. As stated above, Appellant was convicted on two of the four counts in the Superseding

Indictment: Count 3, being a felon in possession of a firearm, pursuant to the Armed Career Criminal Act, 18 U.S.C. § 924(e); and Count 4, a violation of the Bail Reform Act, 18 U.S.C. § 3146. Appellant was sentenced to 300 months on Count 3 and 27 consecutive months on Count 4, followed by three years of supervised release.

Prior to trial, Appellant failed to appear for arraignment and his bond was revoked. As discussed earlier, Appellant was finally located when the Trident Task Force received information indicating that Appellant was located at an apartment complex. Upon entering the specified apartment, the Task Force officers noticed that Appellant had created a hole in a bathroom wall and had escaped to the next-door apartment. Apparently, Appellant thereafter obtained a knife, which he held to the neck of one of the residents. Appellant was eventually apprehended in the next-door apartment and placed in custody. Thus, he made his initial appearance nearly 2 years after the date originally scheduled for his arraignment.

At the sentencing hearing, the District Court found that while Appellant was fleeing from the officers, he used a knife. According to the Court, Appellant's use of the knife "recklessly endangered" the occupants of the next-door apartment to which he had fled. Because the District Court found reckless endangerment, it denied Appellant a sentence reduction for Acceptance of Responsibility. *See* U.S.S.G. § 3E1.1. In fact, the Court found that because of these circumstances, Appellant's sentence should be enhanced for Obstruction of Justice. *See* U.S.S.G. § 3C1.1. Nevertheless, Appellant claims that the denial of his Acceptance of Responsibility credit was improper because the District Court only considered the characteristics of Appellant's offenses, without due consideration being given to his acceptance of responsibility at trial.[21]

---

**20.** Appellant was placed under arrest after Officer Cooper returned to Officer Kula's car with the marijuana and the handgun found in the passenger compartment of Appellant's vehicle. Those two items clearly provided the requisite probable cause for an arrest.

**21.** In his trial testimony, Appellant admitted that he had possessed the firearm and jumped bail, which led to his convictions under the Armed Career Criminal Act, 18 U.S.C. § 924(e), and the Bail Reform Act, 18 U.S.C. § 3146.

The United States Sentencing Guidelines dictate that several factors should be taken into consideration in Acceptance of Responsibility claims. *See* U.S.S.G. § 3E1.1. The relevant factors in this case are the following:

1. Truthfully admitting the conduct comprising offenses of conviction;

2. Voluntary termination or withdrawal from criminal conduct or associations; and

3. Voluntary surrender to authorities promptly after commission of the offense.

U.S.S.G. § 3E1.1 (Commentary). Furthermore, the Guidelines indicate that conduct resulting in an enhancement for Obstruction of Justice under § 3C1.1 ordinarily indicates that a defendant has not accepted responsibility for his conduct. U.S.S.G. § 3C1.1.

Appellant's argument that the District Court did not sufficiently consider his admissions at trial might be valid if the Guidelines only took into consideration express admissions of responsibility at any point in time. This approach, however, is simply not the case. The Guidelines indicate that courts should weigh the totality of a defendant's conduct beginning at the commission of his offense, of which any admission of guilt is one factor.

Although Appellant admitted to some of the conduct underlying his charged crime in his trial testimony, he did not terminate his criminal conduct, and he did not voluntarily surrender to authorities in a prompt fashion.[22] Additionally, the Guidelines reflect that a sentence enhancement for Obstruction of Justice is inherently incompatible with a reduction for Acceptance of Responsibility. *See,* U.S.S.G. § 3C1.1; § 3E1.1.

 On review, the determination of the sentencing judge is entitled to great deference. *United States v. Wilson,* 878 F.2d 921, 923 (6th Cir.1989); *see also* U.S.S.G. § 3E1.1, Commentary, Application Note 5. The determination of whether Appellant has accepted responsibility is a finding of fact,

and enjoys the clearly erroneous standard of review. *United States v. Lassiter,* 929 F.2d 267, 270 (6th Cir.1991). Given this deferential standard of review, and considering the factors stated in the Sentencing Guidelines, we affirm the District Court's denial of the Acceptance of Responsibility.

## V. CONCLUSION

For the above stated reasons, WE AFFIRM the rulings of the DISTRICT COURT.

---

22. Not only did Appellant flee from authorities, but he placed others at risk in the process. His actions during his apprehension (i.e., crawling through a bathroom wall and holding his neighbor's at knifepoint) certainly belie his argument that he voluntarily accepted responsibility for his actions.