NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0864n.06
Filed: October 19, 2005

**No. 04-5614**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| BILLY H. FREDERICK, | ) | EASTERN DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |

Before: BOGGS, Chief Judge; SUTTON, Circuit Judge; RICE, District Judge.[*]

SUTTON, Circuit Judge. Billy Frederick challenges his conviction for being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1), arguing that the rifle at issue should have been suppressed at trial. Because an officer discovered the rifle in plain view in the course of a consensual search, because a reasonable officer could conclude that the rifle presented an immediate threat to officer or public safety and because the rifle at any rate inevitably would have been lawfully seized, we affirm Frederick's conviction but remand for resentencing under *United States v. Booker*, 125 S. Ct. 738 (2005).

_____

[*] The Honorable Walter Herbert Rice, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

I.

On July 10, 2001, Sergeant James Moore of the Sheriff's Department of Hamilton County, Tennessee, received a call from law-enforcement officers of nearby Sequatchie County, Tennessee, informing him that Billy Frederick possessed a vehicle or vehicle parts stolen from Sequatchie County. Accompanied by two Sequatchie County officers, Sergeant Moore proceeded to Frederick's property and found 15 to 20 vehicles (and various automobile parts) scattered about the property. Also at Frederick's property were several of his friends, who were sitting at a workshop located on the property. The sergeant asked Frederick who owned the property, and Frederick responded that his mother owned the lot but that he owned the shop (referred to throughout the trial interchangeably as the "shop," the "workshop" and the "shed").

When the sergeant asked for permission to look around the yard, Frederick consented. Sergeant Moore looked up the VIN from a vehicle in Frederick's yard and determined that the vehicle was stolen; he then called the Tennessee Highway Patrol. After several special agents from the Highway Patrol arrived, they found more stolen vehicles and more stolen vehicle parts. All the while, Frederick accompanied the officers and generally assisted them in identifying various vehicles and parts.

During the search, one of the Highway Patrol special agents entered Frederick's shed and found a rifle. The agent picked up the weapon, determined that it was loaded and called for Sergeant Moore. When Moore arrived, accompanied by Frederick, the agent asked Frederick who owned the

rifle; Frederick replied that it was his. The agent then asked Frederick if he was a convicted felon; Frederick replied that he was.

On September 9, 2003, a grand jury indicted Frederick on one count of possessing a firearm while being a convicted felon. *See* 18 U.S.C. § 922(g)(1). The district court denied Frederick's Fourth Amendment motion to suppress the rifle, and a jury found him guilty of the charge.

Because Frederick possessed a stolen vehicle and was operating a "chop shop" at the time of the felon-in-possession offense, the presentence report recommended that the district court increase his sentence by four levels. *See* U.S.S.G. § 2K2.1(b)(5) ("If the defendant used or possessed any firearm or ammunition in connection with another felony offense . . . , increase by 4 levels."). The district court accepted this recommendation, which led to a Guideline range of 51 to 63 months and which eventually led to a 60-month prison sentence.

## II.

On appeal, Frederick claims that the district court erred in denying his motion to suppress (in violation of the Fourth Amendment) and committed plain error in sentencing him on the basis of judicial factfinding and mandatory sentencing Guidelines (in violation of the Sixth Amendment). We examine the district court's legal conclusions de novo and its factual findings for clear error. *United States v. McCraven*, 401 F.3d 693, 696–97 (6th Cir. 2005).

A.

In construing the Fourth Amendment's prohibition against "unreasonable searches and seizures," U.S. Const. amend. IV, the Supreme Court has held that law enforcement officers may make warrantless seizures of items in plain view so long as (1) "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed," (2) "the incriminating character" of the item was "immediately apparent" and (3) the officer had "a lawful right of access to the object itself." *Horton v. California*, 496 U.S. 128, 136–37 (1990). At the same time that the Court has permitted officers to seize items whose "incriminating character" is "immediately apparent" under the plain-view exception to the warrant requirement, it has permitted officers to seize "objects dangerous in themselves." *Coolidge v. New Hampshire*, 403 U.S. 443, 472 (1971) (plurality); *see United States v. Bishop*, 338 F.3d 623, 626 (6th Cir. 2003). In applying the exception for "objects dangerous in themselves," we have said that "a police officer who discovers a weapon in plain view may at least temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that *the weapon poses an immediate threat to officer or public safety*." *Id.* at 628 (emphasis added).

The parties share considerable common ground in applying these principles here. They do not dispute that Frederick had authority to permit the officers to enter the property initially and to enter the shed eventually. They do not dispute that the rifle was in plain view once the officers entered the shed. They do not dispute that the rifle, when the agent first spotted it inside the shed, did not have an "incriminating character" that was "immediately apparent." *Horton*, 496 U.S. at

136–37. And they do not dispute that the rifle falls into a class of "objects dangerous in themselves." *Coolidge*, 403 U.S. at 472. What divides the parties is whether "a reasonable officer would believe, based on specific and articulable facts, that the weapon pose[d] an immediate threat to officer or public safety." *Bishop*, 338 F.3d at 628.

The district court, in our view, had ample grounds for holding that this weapon did pose such a threat. The rifle lay in an open and accessible place. *Cf. United States v. Myers*, 308 F.3d 251, 267 (3d Cir. 2002) (suppressing a firearm seized during search incident to arrest because the firearm was not "conceivably accessible" to the defendant). The officers were not alone, as several of Frederick's friends and Frederick himself were milling about the area and were unrestrained. In the context of these undisputed facts, the officer surely had authority at a minimum to pick up the weapon to determine whether it was loaded. And once he had determined that it was loaded, the officer also had authority to take the relatively minor additional step of temporarily seizing the rifle to determine who owned it and to maintain immediate control of it. *See Jennings v. Rees*, 800 F.2d 72, 75 (6th Cir. 1986) (relying on public safety considerations to conclude that seizing a loaded handgun found in plain view during the execution of a search warrant was reasonable because of "the potential for mischief that loaded handguns tend to present"); *United States v. Chapman*, 549 F.2d 1075, 1078–79 (6th Cir. 1977) (concluding that the seizure of a rifle was reasonable when the lawfully positioned officer spotted it in plain view and when at least nine other individuals were in the house at the time of the raid); *United States v. Isham*, 501 F.2d 989, 991 (6th Cir. 1974) (holding that the seizure of a rifle from a car was reasonable both under the public-safety rationale and under *Terry*'s self-

protection rationale even though the defendant already had been handcuffed); *United States v. Southern*, No. 99-1736, 2000 WL 1769633, at *7 (6th Cir. Nov. 16, 2000) ("[T]he officers had cause to temporarily seize the pistols [found in plain view] for safety reasons (based upon reasonable suspicion) before they even read the serial numbers" and discovered the pistols were stolen property). Notably, Frederick has not brought to our attention a single case in which a court—any court—has held that officers could not temporarily seize a loaded and accessible rifle plainly viewed in the course of an otherwise lawful search conducted in the presence of the suspect and his friends.

Frederick counters that the record contains no evidence that the officers in fact believed that the rifle posed an immediate danger. Frederick Br. at 21; *see also* Frederick Reply Br. at 4–6 (quoting testimony from officers that they did not fear for *their own* safety that day). But the *Bishop* test asks not whether the officers in fact feared for their own safety but whether a reasonable officer informed of these facts could conclude that the weapon posed an immediate threat to officer or public safety. 338 F.3d at 628. As an objective rather than a subjective test, it may be satisfied in the absence of testimony of actual fear.

Frederick also argues that instead of temporarily seizing the rifle, the officers should have secured the shed and obtained a warrant for the rifle. Attempting to bolster this argument, he points to the following language from *United States v. McLevain*, 310 F.3d 434, 443 (6th Cir. 2002): " . . . that generally an officer should get a warrant if possible before he seizes an item in plain view. He cannot seize absent exigent circumstances. If he could get a warrant, then he cannot use the 'plain view' exception for the evidence." Frederick Br. at 15. But the ellipses omit a pertinent

qualification. The full sentence reads: "As noted in *Horton*, this requirement of a lawful right of access means that generally an officer should get a warrant if possible before he seizes an item in plain view." *McLevain*, 310 F.3d at 443. Because Frederick's consent to the search created "a lawful right of access" no less than a warrant would have, *McLevain* does not advance his position.

All of this shows that the officers permissibly seized the rifle temporarily. What the officers learned after taking control of the weapon—that Frederick owned it and that he was a convicted felon—gave them authority to seize the weapon permanently. *See United States v. Weatherspoon*, 82 F.3d 697, 699 (6th Cir. 1996) (per curiam) ("Once the officer saw the barrel of a gun sticking out from under the seat, and given Mr. Weatherspoon's explanation of why it was there[—that he was looking for someone who had stolen property from him—], it was not unreasonable for the officer to seize the weapon without a warrant."); *see also United States v. Santiago*, 410 F.3d 193, 201 (5th Cir. 2005) ("[B]ecause the deputies were also aware that Santiago had prior criminal convictions, the incriminating character of the firearm was immediately apparent.").

Even were this not the case, even were it unclear whether the officers could seize the rifle temporarily or permanently, Frederick would face another hurdle in reversing the district court's decision: the inevitable discovery rule. Under this doctrine, courts need not exclude unlawfully obtained evidence "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *United States v. Nix*, 467 U.S. 431, 444 (1984); *United States v. Kimes*, 246 F.3d 800, 804 (6th Cir. 2001). To exclude "physical evidence that would inevitably have been discovered," the Court has explained,

"adds nothing to either the integrity or fairness of a criminal trial." *Nix*, 467 U.S. at 446. The inevitable-discovery exception looks at events "as they existed at the instant before the unlawful search" and asks courts to determine "what would have happened had the unlawful search never occurred." *Kimes*, 246 F.3d at 804. "Although some speculation about how events would have unfolded in the absence of the illegal search is necessary under this doctrine, we must keep speculation at a minimum by focusing on demonstrated historical facts capable of ready verification or impeachment." *United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002) (quotations omitted). "The government can satisfy its burden by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." *Id.*

What we have here is not so much a question of inevitable discovery but of inevitable seizure. No one doubts that the officers were permitted to see the weapon. And no one doubts that the officers would have asked Frederick whose weapon it was once they had seen the rifle, whether they picked up the rifle initially or not. Yet Frederick has given us no reason to think that the encounter would have unfolded differently if the officers had asked him whether he owned the weapon and whether he was a convicted felon before, rather than after, picking up the weapon. Nor can we conceive of any reason why a suspect would admit to owning a weapon held in front of him by an officer but decline to make that admission when the officer asks the same question while pointing to the weapon. To exclude the rifle in this setting would "wholly fail[] to take into account the enormous societal cost of excluding truth in the search for truth in the administration of justice."

*Nix*, 467 U.S. at 445; *See also State v. Cobb*, 743 A.2d 1, 38–41 (Conn. 1999) (admitting evidence "under an 'inevitable seizure' variation of the inevitable discovery doctrine" where the discovery of a victim's body revealed evidence linking the deceased victim to the already impounded defendant's car and concluding that the victim's bag found in the impounded car would inevitably have been seized).

B.

Frederick also challenges the enhancement of his sentence by four levels on the basis of (1) the district court's finding that he possessed the firearm in connection with another felony offense and (2) the district court's application of mandatory Sentencing Guidelines. *See United States v. Booker*, 125 S. Ct. 738 (2005). Because the government does not contest the point, we remand the case for resentencing under non-mandatory Guidelines.

III.

For these reasons, we affirm Frederick's conviction but remand the case to the district court solely for resentencing.

**Boggs, Chief Judge,** concurring in part. I agree with the majority that the rifle in question would inevitably have been seized lawfully, in light of the course of the questioning following the rifle's discovery, whether or not it had been "seized" initially. I would also affirm on the basis that, even were the rifle to have been seized unlawfully, there was absolutely no connection between its "seizure" and the subsequent discussion and confession. In short, though the tree may have been poisonous, its fruits were never consumed or introduced.

I write separately, however, to distance myself from the court's conclusion, in answer to the question correctly stated at the top of page 5, that "a reasonable officer would believe, based on specific and articulable facts, that the weapon pose[d] an immediate threat to officer or public safety." I simply do not agree with the discussion and conclusion at pages 5-6 that there was sufficient indication of "an immediate threat" to justify a seizure on that basis alone.

While I agree that it is not *necessary* that the seizing officer had a conscious impression of danger, certainly the lack of any such perception should be a factor strongly to be considered. This is particularly true in a situation where there was no hectic melee, in which perceptions did not have time to form clearly. Nor was there an obvious indication of danger, as in *Weatherspoon*, where officers making a traffic stop under ambiguous circumstances would obviously have found a gun barrel sticking out from underneath the driver's seat of a car, to which the driver would be returned, to be a threat. *See United States v. Weatherspoon*, 82 F.3d 697, 698 (6th Cir. 1999). In our case, however, where the officers involved were numerous, the general situation apparently cooperative

No. 04-5614
*United States v. Frederick*

and non-threatening, and the particular officers had control over the immediate area around the rifle and no other person was in immediate proximity, I simply cannot support the court's conclusion.

I therefore concur only in the judgment and in the alternative grounds stated.