**UNITED STATES of America, Appellee,**

v.

**Doug PERRY, Appellant.**

**No. 90–1916WA.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 26, 1990.

Decided Feb. 5, 1991.

Robert Hough, Jr., Fort Smith, Ark., for appellant.

Matthew Fleming, Asst. U.S. Atty., Fort Smith, Ark., for appellee.

Before ARNOLD, Circuit Judge, and FLOYD R. GIBSON and HEANEY, Senior Circuit Judges.

FLOYD R. GIBSON, Senior Circuit Judge.

Perry appeals his conviction under 18 U.S.C. §§ 2 and 2113(a) (1988) for bank robbery, advancing numerous points of error. Upon review of the trial record and after consideration of each claim, we find no error and affirm the conviction.

## I. BACKGROUND

On November 7, 1989, a Van Buren, Arkansas, bank was robbed of some $2,500. The teller inserted a dye pack in the bag given to her by the robber. A security camera recorded the robbery. One week later, on November 14, in Chalmette, Louisiana, a Radio Shack was robbed of merchandise and money.

That afternoon an off-duty officer, Sgt. Mendel of the St. Bernard Parish, Louisiana, Sheriff's Office, spotted a vehicle whose description and license plate matched those of the getaway vehicle from the Radio Shack crime. The car was moving along the shoulder in front of Chalmette High School as Sgt. Mendel drove by. After confirming the description and plate number by radio, he asked for backup units. Meanwhile, the driver had parked the car in the high school lot, and its two occupants exited and walked across the street to a grocery store, Tag's Meat Market, which was about two hundred feet from the parked car. The occupants were Perry and Rodney Dale Utley. Once additional officers arrived, Perry and Utley were arrested at Tag's for the Radio Shack robbery and then taken to the Radio Shack for identification. Their car remained parked and locked at the high school lot.

Sgt. Reybon of the sheriff's office was also off-duty that afternoon. He went to the scene of the arrest, which was en route to his home, after hearing about it on his police radio. By the time he arrived, the arrests had been made. He drove his vehicle to the suspects' car and parked behind it. He looked inside the car and saw articles from Radio Shack on the front passenger seat and floorboard. In the back he saw a large pile of things, mostly clothing, topped off with what he believed to be packs of batteries from Radio Shack. Sgt. Reybon testified at the suppression hearing that at first he thought the large pile was another person and that he was concerned about discovering a weapon. Suppression Hearing Tr. at 25–27.

Because the car was locked, Sgt. Mendel used a "slim-jim" to unlock it. No search warrant was sought or issued. Under cover from another officer, Sgt. Reybon then determined if anyone was in the back seat. Pushing back the passenger seat, he noticed a large soft-drink cup and shreds of burned and dye-stained U.S. currency on the floor.[1] A plastic pistol and live ammunition were found in the car as well. Sgt. Reybon removed some clothing that matched the description from the robbery and the Radio Shack items and gave them to another officer so that they could be taken to the Radio Shack to aid in the identification of the perpetrators and verification of the stolen goods.

The car was towed to the back lot of the sheriff's office. That evening, and again without a search warrant, Sgt. Reybon opened the trunk to the car with keys that had been taken from either Perry or Utley. He photographed the trunk's interior as it appeared, and then began to remove items therefrom. Sgt. Reybon characterized the search he made as one for inventory. He seized dye-stained clothing and currency from the trunk as well as the title to the car (which was in the name of neither Perry nor Utley) to be held as evidence. The exploded dye pack was found in January 1990 along U.S. Interstate 40 outside Van Buren, Arkansas, by a state highway department employee.

A suppression hearing was held to determine the admissibility of the evidence discovered by the warrantless searches and seizures. The district court[2] concluded that no fourth amendment violation had occurred and that the evidence would not be excluded. Thus, the evidence came in at Perry's trial for bank robbery. Among other evidence, a still photographic image from the bank's video recorder was introduced. Perry hoped to impeach a bank teller, who previously testified, with a videotape from a television program of another unrelated bank robbery. The trial court would not allow the tape to be admitted, holding it to be hearsay and, also, probably not relevant. Perry was duly convicted and sentenced.

## II. DISCUSSION

Perry's appeal challenges the district court's rulings on suppression and several evidentiary questions. We have examined each of his contentions, but conclude, as our delineation of the facts may have foretold, that only the fourth amendment issue merits substantial written analysis.

Perry's argument is simple: the searches of the car and its contents and seizures of the discovered items violated the fourth amendment's proscription of unreasonable intrusion by the government. More precisely, he maintains that the conduct of the officers from the St. Bernard Parish Sheriff's Office did not fall within any of the well-recognized exceptions to the exclusionary rule that would otherwise permit the introduction of the warrantlessly-seized evidence. The district court concluded that the actions of the police were not in contravention of the fourth amendment under the automobile exception. Suppression Hearing Tr. at 68–69. The district court relied on two Supreme Court cases, and we begin our discussion with those cases.

---

1. Later, when the car was impounded, Sgt. Reybon took a photograph of this interior scene.

2. The Honorable H. Franklin Waters, United States District Judge for the Western District of Arkansas.

In a prohibition vintage case, *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the Court, after reviewing the state of fourth amendment law to that date, announced that a search of an automobile could be conducted without a warrant where it was founded on probable cause to believe that contraband liquor was being carried. *Id.* at 155–56, 45 S.Ct. at 285–86. The case dealt with the transportation of bootleg whiskey in violation of prohibition and the federal laws enforcing it. A more modern pronouncement of the same reasoning is found in a narcotics case, *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). There the search was conducted of the trunk of an automobile, including containers discovered therein, on the reasonable belief that heroin was being secreted. At issue was the scope of the search. While the High Court reiterated that warrantless searches are per se violative of the fourth amendment unless they fall within a carefully tailored exception, *id.* at 824–25, 102 S.Ct. at 2172–73 (quoting *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (citation omitted)), the Court concluded that the *Carroll* exception was such a carefully tailored exception into which the case fell. The Court further defined the exception as one that allows for a warrantless search whose scope is "no broader and no narrower than a magistrate could legitimately authorize by warrant."

*Id.* 456 U.S. at 825, 102 S.Ct. at 2173. The Court held that "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.*

The occupants of the vehicle in this case had just been arrested for robbery when the first search was conducted. This search was founded on probable cause to believe that the vehicle contained stolen goods and money and was no broader than a warrant would have allowed. Some of the goods were even in plain view of the officer who conducted the search. That the evidence of another crime was thereby discovered does not make the probable cause to search for the stolen items and money from Radio Shack any less reasonable. In fact, that discovery gave Sgt. Reybon even greater probable cause to search the trunk for evidence of contraband.[3] The items discovered there were also found in a search no broader than a warrant would have allowed. The somewhat later time frame of the trunk search did not affect the probable cause to believe that stolen goods were contained there.

Because valid concerns can be maintained that the fourth amendment's protection is easily eroded if one exception is allowed to build on another, we eschew any alternative holding and rely only on application of the standard from *Ross.*[4] Relying

---

**3.** Once Sgt. Reybon discovered the shreds of dye-stained money in the search at the scene, we also believe he had probable cause to believe that contraband from a bank robbery might be concealed elsewhere in the vehicle. He testified that he understood the impact of the discovery of dye-stained materials as possibly linking the vehicle and its occupants to a bank robbery. Suppression Hearing Tr. at 29–30. Thus, his later search at the back lot was supported by probable cause based on the Radio Shack robbery and a possible bank robbery. *See United States v. Thompson,* 906 F.2d 1292, 1298 (8th Cir.) ("We have no trouble finding probable cause to search the trunk ... particularly after the search of [the vehicle's] interior further corroborated [a tip about a bank robbery]."), *cert. denied,* —— U.S. ——, 111 S.Ct. 530, 112 L.Ed.2d 540 (1990).

**4.** We do not rely on *California v. Carney,* 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), because we do not find it exactly apposite as

*Ross* is. In *Carney,* the Court further delineated the automobile exception in a case whose facts involved a motor home and some nice questions about whether a motor home is more like a residence or a vehicle. The mobility of the vehicle influenced the Court's thinking, and, ultimately, the Court concluded the search conducted was reasonable under the *Ross* standard because it was a search that a magistrate could have authorized. *Id.* at 394–95, 105 S.Ct. at 2070–71.

While the mobility of automobiles is part of the reasoning behind *Ross,* the question is not, as Perry has argued, whether the car is likely to be driven off; the question is whether probable cause that contraband is within the vehicle supports a search within the scope that a warrant would have authorized. It is the characteristic mobility of all automobiles, not the relative mobility of the car in a given case, that gives rise to the *Ross* standard which allows for warrantless searches when probable cause exists. *See Ross,*

only on the automobile exception, we have avoided discussion of the plain view and inventory exceptions as they might apply to these facts.[5] We simply hold that the searches conducted here were within the *Ross* parameters of the automobile exception.

However, we agree with the district court (and it is worth noting) that it is "advisable," "better practice," and just plain "smarter," Suppression Hearing Tr. at 68, for officers to first obtain a warrant whenever possible. Although police officers operate under real-live circumstances and although their decisions must be made without the benefit of considered reflection, those decisions cannot be made with indifference to what the Constitution requires for their legality. Undoubtedly, a police officer has the ability to immediately and irrevocably affect the constitutional rights of an individual, but no violation occurred in these searches.

The decision to search without a warrant proved right in this case, but a warrant would have made it a non-case and arguably could have been easily obtained. Nevertheless, these facts, as described above, fall within the *Carroll–Ross* automobile exception to the exclusionary rule. Thus, we hold that the district court's conclusion that a warrant was not required to conduct the searches and seizures made and its subsequent denial of Perry's suppression motion were correct. *See United States v. Williams,* 714 F.2d 777, 781 (8th Cir.1983) (citing *Ross*) (search of persons and automobile on suspicion of contraband from bank robbery).

■ Perry advances several other arguments which we discuss only briefly. First, Perry claims that a motion for mistrial should have been granted because the

prosecutor's opening remarks indicated that a certain witness would testify to connect the dye-stained materials to the defendants, yet no such witness testified. This amounted to prosecutorial misconduct, according to Perry, because the government persuaded the jury to link the dye-stained objects to him and circumstantially to the bank robbery without putting on a witness. We disagree. The government had a witness for the introduction of each piece of evidence. It simply did not have a witness who said the dye pack found produced the dye stains on the various objects, which were introduced without objection. Presumably some sort of chemical analysis would prove out the connection, and the government would put on an expert who ran the tests—and intended to do so. The witness did not arrive to testify, and the government's case was thereby made weaker because without the chemical evidence the government could only show the circumstantial relationship between the dye pack and the dye-stained objects. Perry was free to vigorously cross-examine on that point and present evidence, if any, that the dye stains did not come from the dye pack, the contrary being the natural inference. The course of the evidence concerning the dye pack does not evince prosecutorial misconduct, much less error for failure to grant a mistrial. The district court cautioned the jury that the remarks of counsel in opening statements were not evidence, gave a standard instruction to that effect as well, and even offered to let Perry draft it. The district court also offered Perry a continuance so that he could get the benefit of the government's no-show witness, who, Perry claimed, would yield favorable testimony. Trial Transcript at 100–09. Perry did not avail himself of the offer. We see no resulting error.

---

456 U.S. at 804–09, 102 S.Ct. at 2162–65 (discussing *Carroll* ); *Carroll,* 267 U.S. at 153, 45 S.Ct. at 285. Automobiles as a class, so to speak, are places where individuals have lesser expectations of privacy. The motor home in *Carney* was arguably part automobile, part residence. Thus, we also avoid *Carney* on the strength of Justice Stevens' dissent therefrom, *id.* 471 U.S. at 395–408, 105 S.Ct. at 2071–78 (Stevens, J., dissenting), because of the "hybrid character" of

motor homes, particularly because he was the author for the Court in *Ross.*

**5.** Plain view, of course, could only support the search at the scene. The inventory exception is a weak support because the district court made no findings in that regard. In fact, the court expressed doubt that the search could be supported as only an inventory search. Suppression Hearing Tr. at 69.

Second, Perry complains that the district court wrongly used a still photographic image from the videotape that was made of the bank robbery. Perry argues that this still was not an original or a duplicate of the videotape that was available and admitted and that only the original videotape should have been allowed into evidence under Fed.R.Evid. 1001 and 1002. Though not claiming the knowledge of the Lumiere brothers, we hold that a still photographic image made from a videotape recording is a duplicate as required by Rule 1001(4) because it is "a counterpart produced by the same impression as the original...." Fed.R.Evid. 1001(4). The evidence had the other requisites for admission. Thus, the district court did not abuse its discretion in admission of the still image.

Third, Perry complains about another videotape. He argues error by the district court's denial of his use of a videotape of another bank robbery (obtained from a television show) for purposes of impeaching the teller who identified him. The court disallowed use of the tape because it was hearsay and the teller had never viewed it. Perry asserts that the teller could have viewed the tape on cross-examination, though he did not seek to use it at that time because his goal was to introduce the tape in his defense for impeachment purposes. He hoped to show unreliability in the teller's identification of him as, apparently, the robber in the disallowed tape resembled Perry. Beyond the highly questionable probative value of the tape, we simply conclude that the district court did not abuse its broad discretion in this evidentiary matter.

Fourth, Perry argues that the district court improperly admonished his counsel concerning the course of questioning of prospective jurors during voir dire, thereby abusing its discretion and prejudicing the jury. The record reveals this claim is without merit. Lastly, Perry advances a cumulative effect claim that, given our disposition of his preceding claims, is also without merit.

### III. CONCLUSION

Because Sgt. Reybon had probable cause to believe the fruits of a crime were in the car in which Perry was riding, his warrantless searches of the car were not violative of the fourth amendment and suppression of the evidence seized was not required. For the reasons given, we also conclude that no error in the trial and conviction of Perry has been shown. We affirm.