RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0115p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

       *v.*

JOSE GALAVIZ, also known as Jose Galaviz,
Jr.,
              *Defendant-Appellant.*

No. 07-2518

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 07-20009—Thomas L. Ludington, District Judge.

Argued: January 14, 2011

Decided and Filed: May 6, 2011

Before: MERRITT, ROGERS, and WHITE, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Rod O'Farrell, Saginaw, Michigan, for Appellant. Margaret Marie Smith, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Rod O'Farrell, Saginaw, Michigan, for Appellant. Jennifer J. Sinclair, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

       WHITE, J., delivered the opinion of the court, in which MERRITT and ROGERS, JJ., joined. MERRITT, J. (pp. 22–25), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

       HELENE N. WHITE, Circuit Judge. Defendant Jose Galaviz appeals his conviction and sentence following his plea of guilty to being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1). He challenges the district court's denial of his motion

1

to suppress the warrantless seizure of a gun from his vehicle, and asserts that the district court erred in calculating the applicable sentencing guideline range because it improperly counted a past crime as part of his criminal history. Galaviz also raises a new challenge to his sentence in an untimely reply brief. We affirm the district court's denial of Galaviz's motion to suppress, but reverse its calculation of his sentence under the United States Sentencing Guidelines and remand for resentencing.

**I**

On December 27, 2006 at 2:46 AM, a woman placed a 911 call from the Admiral gas station on Dixie Highway in or near Bridgeport, Michigan reporting that she had just been robbed at gunpoint. The caller, who was distraught and intermittently sobbing, reported that a black male and/or a black female had held her up at gunpoint and had left the scene in a "white car." After asking a series of clarifying questions, the 911 operator asked the caller, "can you describe the – would it have been like a white Cavalier?" The caller, while sobbing, replied "yes," but then after several unintelligible words, told the dispatcher that he should talk to her sister because she would know better what kind of car it was. The sister took the phone and the dispatcher asked, "can you describe the vehicle at all?" The sister responded, "I don't know what kind. It was a white car. . . . It was a white car." At that point officers arrived at the scene and the dispatcher instructed the sister to end the call and speak to the responding officers.

At 2:48 AM, a dispatcher broadcast via police radio that the suspects were "last seen driving a white vehicle south on Dixie." When asked by an officer to clarify the description, the dispatcher said, "all I have is a white vehicle, sir." In the next few minutes, several officers made radio transmissions indicating that they were investigating white cars they encountered on the road.

Saginaw County Sheriff's Deputy Kurt Webber was on patrol in a squad car during this time and was listening to these transmissions. At the intersection of Webber

Street and Genesee Avenue in Saginaw,[1] Deputy Webber saw a white Lincoln Town Car stopped at a traffic light facing westbound on Webber, across Genesee from him. The driver of this car was Defendant Galaviz. Thinking that it might be the car described in the transmissions about the robbery, Deputy Webber drove past the white Lincoln and then turned his car around to follow it. Webber testified that after he turned his car around the Lincoln "accelerated away from [him]" and, according to his visual estimation, exceeded the posted 25 mile per hour speed limit.[2] Deputy Webber followed the car as it made several turns in a residential area. The white car then turned into a driveway at 332 Carter Street and parked. Deputy Webber pulled his car up at the base of the driveway, blocking the white car. When Webber exited his vehicle, the driver of the white Lincoln, Galaviz, was already out of his car and walking toward the front door of the house. Webber observed that Galaviz "looked like a Hispanic male," not a black male or black female as the suspect was described in the radio transmissions. Webber ordered Galaviz to return to his vehicle. When Galaviz continued to walk toward the house, Webber activated the overhead flashing lights on his car. Webber ordered Galaviz to stop several times. Galaviz repeatedly stated that he "didn't do anything," as he walked up a wheelchair ramp to the front door of the house.

According to Webber, when Galaviz reached the front door, he "knocked," "kicked" and "banged" on the door and was "screaming and yelling for someone inside to let him in." Webber ordered Galaviz to stop and to get on the ground, and then drew his taser. Galaviz refused to stop or to get on the ground. Webber warned Galaviz that if he entered the house, Webber would employ the taser on him. Soon after this warning, the door opened and Galaviz began to enter the house; Webber testified that it was unclear to him whether Galaviz forced the door open or was let into the house. Webber fired the taser, which struck Galaviz. Galaviz screamed and then the door closed. When

---

[1] Genesee Avenue and Dixie Highway, on which the Admiral gas station was located, are the same road. The road is called Dixie Highway in Bridgeport Township (where the Admiral is), and Genesee Avenue in Saginaw, where Deputy Webber was located. The intersection of Genesee Avenue and Webber Street is approximately two miles from the Admiral gas station.

[2] Deputy Webber testified that although driving in excess of the speed limit "would have been a violation," he "wasn't looking for any kind of violation" because he was following Galaviz on suspicion of being involved in the robbery, not for a traffic violation. Webber never issued a citation to Galaviz.

the door closed, Webber radioed for assistance and then entered the house with the permission of the residents.[3] The residents of the house told Webber that Galaviz had run out the back door. Webber looked through the back door and did not see anyone; as he was looking, other police cars arrived. He described the driver of the car over the radio as a "Mexican male, mustache, wearing a gray shirt, short hair." The responding officers searched the house with Webber, found Galaviz in the basement, and removed him from the house.

While Galaviz was still inside the house, police officers at the scene made a visual inspection of the white car parked in the driveway and observed what looked like part of a handgun sticking out from under the front seat. Unable to obtain car keys from Galaviz, police called a wrecker service to unlock the car. Once the car was unlocked, they seized a revolver located on the driver-side floor, partially under the seat.

Galaviz was indicted on a federal charge of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Galaviz filed a suppression motion arguing that the gun was seized in violation of the Fourth Amendment. After an evidentiary hearing,[4] the district court denied the motion. Galaviz then entered into a plea agreement pursuant to Federal Rule of Criminal Procedure 11, in which he preserved the right to appeal the denial of his suppression motion. The court accepted the plea, held a sentencing hearing, and sentenced Galaviz to 70 months in prison, followed by three years of supervised release. Galaviz timely appealed.

---

[3] The residents of the house were former neighbors of Galaviz.

[4] The electronic tapes of the suppression hearing were lost or destroyed before being transcribed. Some or all of the court reporter's shorthand notes were also lost. As a result, the court reporter was only able to create a partial transcript based on her remaining notes. The transcript of the suppression hearing contains only part of the testimony of Deputy Webber and none of the testimony of his supervisor, Sergeant Przybylski.

## II

### A. Standard of Review

This Court reviews a district court's factual findings in a decision on a motion to suppress for clear error and its legal conclusions de novo. *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009). "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)). "When a district court has denied a motion to suppress, this Court reviews the evidence in the light most likely to support the district court's decision." *Id.* (internal quotation marks omitted).

### B. The District Court's Order Denying Galaviz's Motion to Suppress

The district court denied Galaviz's motion to suppress solely on the basis that Deputy Webber "had specific and articulable facts, under the totality of the circumstances, to justify stopping Defendant to investigate whether he committed the robbery" in accordance with the standard set out in *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). *United States v. Galaviz*, No. 07-20009-BC, 2007 WL 2324949, at *1 (E.D. Mich. Aug. 14, 2007). In order to make an investigative *Terry* stop without a warrant, an officer must have reasonable articulable suspicion that "the person apprehended is committing or has committed a criminal offense." *Arizona v. Johnson*, 129 S. Ct. 781, 784 (2009); *Terry*, 392 U.S. at 21. When making reasonable-suspicion determinations, reviewing courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

The district court identified several relevant factors justifying the *Terry* stop:

> (1) the short time (about ten minutes or less) between the occurrence of the armed robbery and Webber's observation of Defendant's vehicle; (2) the close geographic proximity of the location of the robbery and the site where Webber observed Defendant's car; (3) the color of the vehicle

that corresponded to that announced by the police dispatcher; and (4) the minimal traffic due to the hour of the night. Those details sufficed to justify Webber's interest in further investigation. Additionally, as stated on the record, Defendant rapidly accelerated his vehicle away from a marked police car that turned to follow him, and he later disregarded the officer's directives to stop. Also, Defendant knocked, kicked, and banged on the door of a residence to which he sought entry, which showed his apparent lack of authorization to enter the residence.

*Galaviz*, 2007 WL 2324949, at *1. The court did not, however, provide any discussion of the basis for upholding the warrantless search of Galaviz's car, apparently assuming that if Webber had reasonable suspicion to support an investigative seizure of Galaviz, then the search of the car and the seizure of the gun would be justified. Galaviz did not challenge the search of the car and seizure of the gun on separate grounds, apparently making the same assumption. In opposing the motion to suppress, the government argued that the seizure of the gun was not a fruit of the *Terry* stop or the arrest, and the plain-view doctrine provided an alternative ground on which to uphold the seizure of the gun. Galaviz argued in reply that officers were not lawfully in a position from which to view the gun, and therefore that the plain-view doctrine did not apply. The district court did not address these arguments.

Although we agree that Webber had reasonable suspicion to pursue Galaviz's car and to stop it to investigate whether it was the car involved in the robbery,[5] once Webber observed Galaviz's physical features and saw that he was a Hispanic male, and thus did not match the description of the robbery suspect as a black male or black female, the reasonableness of the suspicion was undermined. Indeed, Webber testified at the suppression hearing that Galaviz "looked like a Hispanic male," and that he was able to clearly identify him as such in the available light. Webber further conceded that, because the robbery suspect identified in the radio transmissions was a black male or

---

[5]Deputy Webber initially had reasonable suspicion to stop Galaviz based on the color and location of his car and the time of the encounter relative to the time of the reported robbery, as well as Webber's perception that Galaviz accelerated away from him at a speed in excess of the posted speed limit. *See United States v. Hurst*, 228 F.3d 751, 756-57 (6th Cir. 2000) (holding that officer had reasonable suspicion to stop a Mercury Cougar containing three persons when radio broadcasts had described suspects' car as a Ford Thunderbird containing two persons because the cars "roughly match[ed]" each other "in color and style" and the Cougar was observed "at a location consistent with the time needed to travel to that point from" the scene of the crime).

black female, identifying Galaviz as a Hispanic male constituted conclusive information that he was not a suspect in the robbery.  *See United States v. Jackson,* 188 F. App'x 403, 410 (6th Cir. 2006) (unpublished) (holding that, even if police had probable cause to stop defendant's car based on purported similarity to the suspect's vehicle, they should have immediately released him once they saw that his "physical appearance differed significantly from that of the suspect").

Whether reasonable suspicion was revived by subsequent events, including Galaviz's failure to heed Webber's commands to stop, Galaviz's kicking, banging, and screaming in an attempt to gain entry to the house, and Webber's lack of clarity as to whether Galaviz forced his way into the house or was permitted to enter by the residents, is a close question we need not reach because, even assuming arguendo that Webber lacked reasonable suspicion to seize Galaviz, discovery of the gun is not a "fruit of the poisonous tree."  *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).  The gun may only be suppressed if its discovery is a "fruit" of the seizure of Galaviz.  "[T]he 'fruit of the poisonous tree' doctrine . . . bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure."  *United States v. Williams*, 615 F.3d 657, 668 (6th Cir. 2010) (quoting *United States v. Pearce*, 531 F.3d 347, 381 (6th Cir. 2008)).  Not all evidence the discovery of which shares some causal connection to an unconstitutional seizure should be suppressed, however.  The Supreme Court has never

> h[e]ld that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light *but for* the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Hudson v. Michigan*, 547 U.S. 586, 592 (2006) (quoting *Wong Sun*, 371 U.S. at 487-88) (internal quotation marks omitted).

Here, the gun was discovered by police officers who arrived at the scene in response to Webber's call for backup.  Those officers observed the gun either while

Webber was still searching for Galaviz inside the house, or contemporaneous with the arrest of Galaviz in the basement. They discovered the gun because it was in plain view, and not as a result of anything Galaviz said or anything found on Galaviz's person after his detention. Although Webber's pursuit of Galaviz was a but-for cause of the officers' discovery of the gun, the gun is not a fruit of the seizure as defined by *Wong Sun* and progeny.

### C.  The Plain-View Exception

Although the district court's order denying Galaviz's motion to suppress addressed only the *Terry* issue, we may uphold the denial of the motion to suppress on any ground supported by the record. *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009); *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994). We analyze the search of Galaviz's car and seizure of the gun under the automobile and plain-view exceptions to the Fourth Amendment's warrant requirement.

The Fourth Amendment imposes a per se requirement that police officers obtain a warrant prior to conducting a search. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). Two exceptions to this requirement are for searches of vehicles, *id.* (citing *Carroll v. United States*, 267 U.S. 132, 153 (1925)), and for objects in plain view, *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). The automobile exception allows officers to search a vehicle without a warrant if they have "probable cause to believe that the vehicle contains evidence of a crime." *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (citation omitted). This exception has traditionally been based on the "'ready mobility' of the automobile, which created 'an exigency sufficient to excuse failure to obtain a search warrant.'" *Id.* (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) and *California v. Carney*, 471 U.S. 386, 390-91 (1985)). Recent cases have clarified that the automobile exception need not rest on an independent showing of exigency, because "[e]ven in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception." *Id.* (quoting *Carney*, 471 U.S. at 391).

Under the plain-view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) (quoting *Dickerson*, 508 U.S. at 375) (quotation marks omitted).  "[A] motorist has 'no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.'" *United States v. Campbell*, 549 F.3d 364, 373 (6th Cir. 2008) (quoting *United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir. 1996) and *Texas v. Brown*, 460 U.S. 730, 740 (1983)) (alteration in original).

Under the plain-view doctrine, we must first determine whether police were lawfully in a position from which to view the gun.  Galaviz's car was parked in a short driveway adjacent to the house in which Galaviz was eventually arrested.  A photo admitted into evidence at the suppression hearing shows that the driveway was at least two car-lengths long, with a distance of about one car-length from the sidewalk to the corner of the house, and another car-length extending along the side of the house.  The driveway was therefore close enough to the house to possibly constitute curtilage protected by the Fourth Amendment.  *See United States v. Jenkins*, 124 F.3d 768, 772 (6th Cir. 1997) ("[T]he curtilage is considered part of the house itself for Fourth Amendment purposes.").  Given the characteristics of the driveway, however, we find that it was not within the protected curtilage of the house.  Following guidance from the Supreme Court, we look to four factors to evaluate whether area surrounding the home constitutes curtilage:

> (1) "the proximity of the area claimed to be curtilage to the home";
> (2) "whether the area is included within an enclosure surrounding the
> home"; (3) "the nature of the uses to which the area is put"; and (4) "the
> steps taken by the resident to protect the area from observation by people
> passing by."

*Id.* (quoting *United States v. Dunn*, 480 U.S. 294, 301 (1987)); *see also United States v. Estes*, 343 F. App'x 97, 100 (6th Cir. 2009) (unpublished).  Here, the driveway was

directly adjacent to the house. However, it was not enclosed by a fence or other barrier and was short, with the portion of the driveway where Galaviz's car was parked directly abutting the public sidewalk. Further, no apparent steps were taken by the residents of the house to protect the driveway from observation by passersby – no hedges or bushes obstructed the view of the driveway from the sidewalk or street, for example. *See Estes*, 343 F. App'x at 101 (using these factors to find driveway not to be curtilage); *see also United States v. Pineda-Moreno*, 591 F.3d 1212, 1215 (9th Cir. 2010) ("[B]ecause [defendant] did not take steps to exclude passersby from his driveway, he cannot claim a reasonable expectation of privacy in it, regardless of whether a portion of it was located within the curtilage of his home."). Therefore, police officers needed no warrant to enter onto the portion of the driveway on which Galaviz's car was parked, and thus they were lawfully in a position from which to view the interior of the vehicle.

We next must determine whether the incriminating nature of the gun was immediately apparent. If officers were able to clearly identify the object protruding from beneath the driver's-side seat as part of a handgun, then this prong of the plain-view test is satisfied. *See Campbell*, 549 F.3d at 373 (upholding the seizure of a handgun from a vehicle under the plain-view doctrine when the butt of the gun was visible under the passenger seat to an officer standing outside the car). In Michigan, it is a crime to carry a pistol in a vehicle without a firearm license. Mich. Comp. Laws § 750.227; *see also* Mich. Comp. Laws § 776.20 (placing burden of establishing possession of license on the defendant); *id.* §§ 750.227c, 750.227d (criminalizing carrying of other firearms in a vehicle). Therefore, the incriminating nature of a handgun in the vehicle was immediately apparent. Counsel for Galaviz conceded as much at oral argument, but argued that the record is insufficient to show that officers were actually able to identify the object as a gun from their position outside the car. Due to errors by the court reporter, the only testimony regarding the position and visibility of the gun that appears in the suppression hearing transcript is the following exchange from the examination of Deputy Webber:

> Q  After [Galaviz] went in and was Tasered, what led to your attention being drawn to that vehicle?

A [by Deputy Webber]   It was observed by the city officers; they observed a handgun through the window stuck up under the front seat.

Q  Did you then go to the vehicle and look for yourself?

A  Yes, I did.

Q  And what did you see?

A  I saw the handled portion of what appeared to be a revolver sticking out underneath the driver's seat.

Missing from the transcript is the testimony of Sergeant Przybylski, who apparently also discussed viewing the gun.  In addition to the officers' testimony, the government entered into evidence a photo showing a revolver sticking out from under the front seat of a car.  However, none of the testimony preserved in the hearing transcript serves to authenticate that photo, and it appears that the photo was taken after the car door was forced open, from a position below window level and near the floor of the car, and thus does not indicate whether the gun was actually visible through the window of the locked car.[6]  Notwithstanding these deficiencies in the record, however, Webber's testimony describing what he saw is sufficient to establish that the gun was visible from outside the car.

The remaining question under the plain-view doctrine is whether the officers had a lawful right of access to the interior of the locked car so as to seize the gun.  This turns on application of the automobile exception.  The automobile exception allows a warrantless search of an automobile if officers have probable cause to believe the vehicle contains evidence of a crime.  *Smith*, 510 F.3d at 647.  Here, that probable cause was supplied when officers viewed the gun in the car, which constitutes a violation of Mich. Comp. Laws § 750.227.  The right to search the interior of the vehicle under the automobile exception thus provided officers with a lawful right of access to the car sufficient to satisfy the plain-view exception.  *See Boone v. Spurgess*, 385 F.3d 923, 928 (6th Cir. 2004) ("The final requirement [of the plain-view exception], that the officer

---

[6]Also, the photo shows the barrel of the revolver sticking out from under the seat, not the handle as Webber indicated in his testimony.

have a lawful right of access to the object, is meant to guard against warrantless entry onto premises whenever contraband is viewed from off the premises in the absence of exigent circumstances, but does not bar the seizure of evidence in a parked car." (internal citations omitted)).  That the car was locked is also not material under the facts of this case, because the automobile exception provided officers with authority to enter the car.[7] *See United States v. Tilmon*, 15 F.3d 1094, 1994 WL 2774, at *1-3 (9th Cir. 1994) (unpublished table opinion) (upholding search of locked car pursuant to the automobile exception where officer gained access "either by smashing a window or using a coat-hangar"); *United States v. Perry*, 925 F.2d 1077, 1079-80 (8th Cir. 1991) (upholding search of locked car under the automobile exception where officer gained entry by using a "slim-jim"); *see also United States v. Bishop*, 338 F.3d 623, 626-28 (6th Cir. 2003) (holding that plain-view exception provided officer with authority to seize gun by reaching through open window of unattended car); *United States v. Haynes*, 301 F.3d 669, 676-77 (6th Cir. 2002) (assuming that automobile exception could justify officer's entry into locked car using defendant's key (without defendant's consent) given probable cause, but finding that no probable cause existed); *United States v. Weatherspoon*, 82 F.3d 697, 697-99 (6th Cir. 1996) (upholding, under plain-view exception, officer's entry into locked car after seeing barrel of gun sticking out from under the seat).

Therefore, we affirm the district court's denial of Galaviz's motion to suppress.

### III

Galaviz challenges his 70-month sentence on the ground that the district court miscalculated his criminal-history category.  This challenge is not foreclosed by the language of the plea agreement, which provides that "Defendant retains his right to directly appeal the Court's adverse determination of any disputed guideline issue that

---

**[7]**The search of the car was made possible only by calling a wrecker service to unlock the doors after Galaviz refused to turn over the keys.  Although this was permissible under relevant exceptions to the Fourth Amendment, we note that in cases like this – where there is no risk that the car will be moved and where the weapon locked within poses no immediate danger to officers or others – the preferred course of action would be for officers to secure the car and obtain a warrant before forcing entry.  *See United States v. Weatherspoon*, 82 F.3d 697, 699-700 (6th Cir. 1996) (Jones, J., concurring); *see also United States v. Tilmon*, 15 F.3d 1094, 1994 WL 2774, at *2 (9th Cir. 1994) (unpublished table opinion); *United States v. Perry*, 925 F.2d 1077, 1081 (8th Cir. 1991).

was raised at or before the sentencing hearing." The issue of the district court's calculation of his criminal-history category under the Guidelines was raised by Galaviz both in a sentencing memorandum submitted to the court prior to sentencing and at the sentencing hearing. Therefore, under the language of the plea agreement, Galaviz has preserved the issue for appeal.

Although Galaviz does not categorize his challenge to his sentence, we will review the sentence for procedural and substantive reasonableness. *See United States v. Deitz*, 577 F.3d 672, 697 (6th Cir. 2009). Galaviz's "contention that the district court improperly calculated the Guidelines range is procedural in nature." *Id.* On appeal, this Court applies an abuse-of-discretion standard to reviewing the reasonableness of the defendant's sentence. *United States v. Moon*, 513 F.3d 527, 539 (6th Cir. 2008). "In reviewing a district court's application of the Sentencing Guidelines, this Court will 'accept the findings of fact of the district court unless they are clearly erroneous and [will] give due deference to the district court's application of the Guidelines to the facts.'" *Id.* at 539-40 (quoting *United States v. Williams*, 355 F.3d 893, 897-98 (6th Cir. 2003)) (alteration in original). This Court reviews the district court's legal conclusions regarding the sentencing guidelines de novo. *Id.* at 540.

Galaviz argues that he should have been assigned a criminal history category of III instead of IV. With an offense level of 21, the Guidelines range for criminal history category IV is 57-71 months; for category III the range would be 46-57 months. *See* U.S.S.G. Part A, Sentencing Table.

Sentencing Guidelines § 4A1.1(a) provides that three criminal-history points are to be added "for each prior sentence of imprisonment exceeding one year and one month." U.S.S.G. § 4A1.1(a) (2006). Guidelines § 4A1.2(e) establishes a time limit on counting past convictions:

> Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. *Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed,*

*that resulted in the defendant being incarcerated during any part of such fifteen-year period.*

*Id.* § 4A1.2(e)(1) (emphasis added).  Section 4A1.2(k) clarifies that

Revocation of probation, parole, [or] supervised release . . . may affect the time period under which certain sentences are counted as provided in §4A1.2(d)(2) and (e).  For the purposes of determining the applicable time period use the following: (i) in the case of an adult term of imprisonment totaling more than one year and one month, the date of last release from incarceration on such sentence . . . .

*Id.* § 4A1.2(k)(2)(B).  Thus, a prior offense is counted as long as it resulted in the defendant being incarcerated on the sentence anytime during the 15 years preceding the instant offense, including imprisonment for a violation of parole.

On March 30, 1987, Galaviz was convicted in state court of assault with intent to do great bodily harm less than murder.  He was sentenced to 3-10 years imprisonment, and was paroled on November 12, 1991.  The instant weapons-possession offense occurred on December 27, 2006, approximately six and one half weeks beyond the 15-year cutoff, as calculated from Galaviz's date of parole.

However, on December 19, 1991, Galaviz was picked up for a parole violation based on a new firearms charge.  He was returned to a Michigan Department of Corrections facility on the basis of the violation.  He was never convicted of that firearms charge, and was released on February 3, 1992, when his parole supervision was reinstated.  February 3, 1992 is within 15 years of the instant offense.

The only documentary evidence of the reason for and dates of imprisonment for this parole violation is a one-page "Transit List" obtained by the U.S. Probation Office from the Michigan Department of Corrections (MDOC).  The Transit List shows that Galaviz received his first parole on November 12, 1991, was "returned as PV technical" to the Western Wayne Correctional Facility on January 23, 1992, and was "reinstated on parole from institution" on February 3, 1992.  Galaviz was discharged from parole November 12, 1993.  (The term "PV technical" stands for "parole violation technical" or "parole violator technical.")  Galaviz's argument on appeal hinges on the import of

the "technical" parole violation.[8] Galaviz concedes that as long as he was on parole, "he could be re-incarcerated for violation of his parole which could extend his incarceration for an additional period of time, bringing his incarceration within the fifteen (15) year time limitation." He argues, however, that his imprisonment for a "technical" parole violation that was "alleged but dismissed at the time of Hearing" does not constitute imprisonment as a "result" of the 1987 conviction for purposes of § 4A1.2(e)(1). Essentially, Galaviz argues that his imprisonment for a "technical parole violation" should not count because he was not found to have violated his parole, and was reinstated on parole.

Galaviz asserts that a parole violation hearing was scheduled for February 3, 1992, but that the hearing did not take place because no witnesses appeared for it. As the government points out, there is no documentary support in the record for these factual assertions. But the record does support the conclusion that Galaviz was not found to have violated his parole, as he served only 11 days' detention and was never convicted of the underlying firearms charge. The terminology used in the Transit List also supports this conclusion. That document notes that Galaviz was "reinstated on parole." In Michigan, a parolee is "reinstated to parole status" when the parole board is presented with "insufficient [evidence] to support the allegation that a parole violation occurred." Mich. Comp. Laws § 791.240a(8); *see also id.* § 791.241 ("When the parole board ha[s] determined the matter it shall enter an order rescinding such parole, or reinstating the original order of parole . . . ."). At the instant sentencing hearing, Galaviz's attorney asserted that Galaviz was imprisoned in 1992 because there "was an administrative hold on him, in effect, while the process of an alleged violation was occurring." The government, on the other hand, argues that the Transit List states simply that Galaviz was detained as a "PV [Parole Violator] Technical," and that whatever the "technical" reason for classifying him as a parole violator, "'the date of last release from incarceration' attributable to his 1987 sentence was February 3, 1992."

---

[8] A technical parole violation occurs when the parolee violates a condition of parole. *See* Alison Lawrence, National Conference of State Legislatures, *Probation and Parole Violations: State Responses* 4 (2008), available at http://www.ncsl.org/print/cj/violationsreport.pdf ("[A] technical violation of parole occurs when a parolee does not comply with his or her supervision conditions . . . .").

Because that date falls within 15 years of the instant offense, the government argues that the plain language of the Guidelines requires the 1987 conviction to be counted under § 4A1.2(e), and thus the 3 criminal-history points were properly added under § 4A1.1(a).

The district court's determination that Galaviz's imprisonment for the parole violation "resulted from" the 1987 conviction was a finding of fact that this court must uphold unless clearly erroneous. *See Moon*, 513 F.3d at 539-40. The evidence regarding the reason for and nature of the 1992 period of imprisonment for the parole violation does support that Galaviz spent time in a Michigan Department of Corrections facility as a result of an alleged "technical" parole violation. The district court therefore did not clearly err in finding that Galaviz was imprisoned within the fifteen-year period. However, the district court also offered an interpretation of the relevant Guidelines provision, reasoning that as long as Galaviz was on parole, he remained technically under sentence for the 1987 conviction, and thus any incarceration during the pendency of that parole could serve to bring the 1987 conviction within the 15-year period. (*See* Sentencing Hr'g Tr. 20, R. 36.) This is a legal issue, which we review de novo. *See Moon*, 513 F.3d at 40.

Galaviz argues that he was held for a parole violation that was never substantiated, and therefore should not be deemed imprisoned as a result of the 1987 conviction. The Guidelines provide that a prior conviction is to be counted if it "*resulted in* the defendant being incarcerated during any part of [the] fifteen-year period." U.S.S.G. § 4A1.2(e)(1) (emphasis added). Here, Galaviz spent 11 days in an MDOC prison for an alleged violation of his parole from his 1987 conviction and sentence. Those 11 days were thus a "result" of his sentence for the prior conviction. That is not all the Guidelines say on this topic, however. Application Note 1 to § 4A1.1 directs that "[w]here a prior sentence of imprisonment resulted from a *revocation* of probation, parole, or a similar form of release, see §4A1.2(k)." (Emphasis added). Section 4A1.2(k)(2)(B) states that "*[r]evocation of . . . parole . . .* may affect the time period under which certain sentences are counted as provided in §4A1.2(d)(2) and (e)." (Emphasis added). These sections contemplate that a *revocation* of parole may operate

to bring a past conviction within the relevant time period, not merely incarceration pending a determination whether parole was indeed violated or other temporary detention.

Chapter 4 of the Guidelines Manual does not define "revocation." Chapter 7 addresses violations of probation and supervised release for convictions obtained in the federal system.[9] The policy statement at the beginning of Chapter 7 makes clear that "revocation" is a determination of a court, to be followed by resentencing as directed by the relevant statutes and sentencing guidelines. *See* U.S.S.G. Ch. 7, Pt. A. Similarly, § 7B1.3 contemplates that a court will first make a finding of a violation of probation or supervised release, and only then revoke that probation or supervised release and impose an appropriate sentence. *Id.* § 7B1.3(a)-(b). Revocation is therefore a discrete act, separate from the accusation of a violation or even from detention pending a revocation determination.

Under Michigan law, "[a]fter a prisoner is released on parole, the prisoner's parole order is subject to revocation at the discretion of the parole board for cause." Mich. Comp. Laws § 791.240a(1). "Within 10 days after an arrest for an alleged violation of parole, the parolee shall be entitled to a preliminary hearing to determine whether there is probable cause to believe that the conditions of parole have been violated . . . ." *Id.* § 791.239a(1). A parolee is also entitled to a fact-finding hearing on the parole violation charges, *id.* § 791.240a(3), and to a number of due-process guarantees including the rights to an attorney, to written notice of the charges, to present and cross-examine witnesses, and to present other relevant evidence, *id.* § 791.240a(4)-(5). *See also In re Parole of Bivings*, 619 N.W.2d 163, 166 (Mich. Ct. App. 2000) ("Parole revocation proceedings are contested cases . . . ."). "If a preponderance of the evidence supports the allegation that a parole violation occurred, the parole board may revoke parole . . . ." *Id.* § 791.240a(10). Thus, under Michigan law, "revocation of parole" means something beyond detention on suspicion of a parole violation or similar

---

[9]The federal system does not use the term parole, but rather provides for probation and supervised release.

imprisonment.  It requires an adjudication, a specific finding that the parolee violated parole, and then a determination that parole will be revoked.

The record indicates that Galaviz was never found to have violated his parole and was reinstated on parole after 11 days.  Were § 4A1.2(e)(1) the only relevant provision, we would uphold the district court's determination as a reasonable application of the Guidelines' "resulted from" language.  But the language of § 4A1.1, Application Note 1 and § 4A1.2(k)(2)(B) cast significant doubt on such an outcome, and we interpret them to require actual revocation of parole and resulting incarceration within the 15-year period in order for a sentence served outside the period to be counted for the purpose of computing criminal history points.  Our understanding of the purpose of the relevant sentencing guidelines supports this outcome.  The general position of the Guidelines is that "[a] defendant's record of past criminal conduct is directly relevant to [the purposes of sentencing]."  U.S.S.G. Ch. 2, Pt. A, Introductory Commentary.  But the Guidelines include a safeguard to ensure that conduct that is too remote in time is not counted.  Therefore, "[a] sentence imposed more than fifteen years prior to the defendant's commencement of the instant offense is not counted unless the defendant's incarceration extended into this fifteen-year period."  U.S.S.G. § 4A1.1, Application Note 1.  This policy helps guarantee that sentences are fair.  Counting a past criminal sentence solely on the basis that the defendant was detained for a parole violation, but not adjudged to have violated parole, violates this principle of fairness.

It is not enough that, as a factual matter, a parolee is incarcerated while remaining technically under sentence. Otherwise, criminal-history points could be added because a person on parole was arrested and incarcerated for several days on a minor charge – an old traffic offense, for example – that does not constitute a violation of parole. It is also not enough that incarceration "resulted from" a prior offense in the bare sense that a parole violation was alleged and the parolee was detained due to that allegation. The parolee must have been incarcerated due to a revocation of parole, rather than merely have been incarcerated pending determination whether a parole violation occurred in the first place.

Our conclusion finds further support in the rule of lenity.  The "policy of lenity means that the Court will not interpret a federal statute so as to increase the penalty it places on an individual when such an interpretation can be no more than a guess as to what Congress intended."  *United States v. Boucha*, 236 F.3d 768, 774 (6th Cir. 2001) (quoting *Bifulco v. United States*, 447 U.S. 381, 387 (1980)).  Courts may apply the rule of lenity when interpreting the sentencing guidelines.  *Id.* at 775.  "[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a 'grievous ambiguity or uncertainty in the statute,' such that the Court must simply 'guess as to what Congress intended.'"  *Barber v. Thomas*, 130 S. Ct. 2499, 2508-09 (2010) (internal citations omitted).

The "resulted in" language of § 4A1.2(e)(1) and the "revocation of parole" language in § 4A1.2(k)(2)(B) and Application Note 1 to § 4A1.1 are at odds.  We rely on the more-specific terms of the latter provisions to conclude that parole must be actually "revoked" to bring the sentence within the 15-year period.  Our reading of the purpose of the guidelines bolsters this view.  But "[e]ven if one could conclude that there were two rational readings of this Guideline, this Court would be bound to choose the less harsh reading" under the rule of lenity.  *United States v. Sanders*, 162 F.3d 396, 402 (6th Cir. 1998).  That reading would provide that Galaviz's brief incarceration in 1992 does not bring his 1987 conviction within the period because his parole was never revoked.

Therefore, we reverse the district court's determination that the 1987 conviction is properly counted in calculating Galaviz's criminal-history category.  Consequently, we conclude that Galaviz's sentence is procedurally unreasonable, and we remand for recalculation of his criminal-history category in light of this opinion.

## IV

In a reply brief filed approximately nine and one half months late, Galaviz makes an additional argument, not raised in his opening brief, regarding calculation of his criminal history points.  The government has filed a motion to strike the reply brief for: "(1) Failure to file within 17 days after Appellee's Brief; and (2) Raising a new issue."

Galaviz's reply brief is untimely filed without leave of this court, and therefore should normally be stricken on that basis. *See* 6th Cir. R. 26(c) (regarding filing of late documents). Additionally, the reply brief raises an argument not included in the opening brief: that the Sentencing Guidelines were amended after the briefing schedule was over, and that this change should be retroactively applied to the calculation of Galaviz's sentence because his conviction is still on direct appeal. We do not usually entertain new arguments raised for the first time in a reply brief. *See United States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002).

Even if we were to entertain the argument advanced by the brief, however, it would be of no aid to Galaviz. The reply brief states that Galaviz received two criminal history points under U.S.S.G. § 4A1.1(b) for committing the instant offense while he was on supervised release for another crime. The Presentence Investigation Report (PSR), to which Galaviz raised no objections in district court, does state that "[a]s per 4A1.1(b), two points are added if the defendant committed the instant offense while under any criminal justice sentence, including . . . supervised release . . . ." The citation to § 4A1.1(b) seems to be in error, however. In the applicable 2006 edition of the Guidelines Manual, § 4A1.1(b) actually states: "Add **2** points for each prior sentence of imprisonment of at least sixty days not counted in (a)." U.S.S.G. § 4A1.1(b) (2006 ed.). Section 4A1.1*(d)* provides the relevant provision: "Add **2** points if the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status." *Id.* § 4A1.1(d).

Even assuming that Galaviz (and the PSR) intend to refer to § 4A1.1(d) rather than (b), it is unclear what the basis of the new challenge is. Although Guidelines § 4A1.1 was amended effective November 1, 2010, the amendment did not affect the language of subsection (d). *See* Amendment 742, *reprinted in* U.S.S.G. Guidelines Manual, Supplement to Appendix C, at 354. Guidelines Amendment 742 struck subsection (e) of § 4A1.1, which had stated: "Add **2** points if the defendant committed the instant offense less than two years after release from imprisonment on a sentence

counted under (a) or (b) or while in imprisonment or escape status on such a sentence." U.S.S.G. § 4A1.1(e) (2006 ed.). This subsection was not the basis for any of Galaviz's criminal history points, and so the amendment provides no aid to Galaviz. We grant the government's motion to strike Galaviz's reply brief and note, in the alternative, that the argument contained in the brief lacks merit.

**V**

For the foregoing reasons, we **AFFIRM** the district court's denial of Galaviz's motion to suppress but **REVERSE** its sentence of 70 months' imprisonment and **REMAND** for recalculation of the sentence. We also **GRANT** the government's motion to strike Galaviz's untimely reply brief.

---

**CONCURRENCE**

---

MERRITT, Circuit Judge, concurring. The court's opinion persuasively explains how three features of the law operate in this case to eviscerate the warrant requirement of the Fourth Amendment as applicable to this defendant. When the police see a pistol in a parked car in Michigan, two exceptions to the warrant requirement of the Fourth Amendment — the plain-view and automobile exceptions — are stacked with a burden-shifting provision in Michigan's concealed weapons statute, and the result is that the police have broad authority to break into the car and seize the gun without a warrant. As the court analyzes the issue, it is irrelevant how the police's attention came to be focused on the defendant. As it turns out, here the police were responding to a 911 call concerning a suspect in a car with a similar make to that of the defendant, but by the time the events relevant to defendant's ultimate conviction occurred, he had been definitively ruled out of this initial investigation. But that is no matter. While I join the court's opinion and agree that the result in this case is unavoidable in light of controlling authority, I write separately to note just how detached all three of the legal rules that decide this case are from their original rationales, and to emphasize the paucity of constitutional rights enjoyed by automobile owners in the State of Michigan who carry pistols in their cars, even when those guns are carried lawfully.

The court's opinion analyzes the seizure of the pistol in this case under the general framework of the plain-view exception to the warrant requirement. This exception has three elements: that the police be lawfully in a position from which they may view the object to be seized, that the incriminating character of the object be immediately apparent, and that the officers have a lawful right of access to the object when it is seized. *Horton v. California*, 496 U.S. 128, 136-37 (1990). That the first element is satisfied in this case is relatively clear: the police say that they saw the defendant's pistol sticking out under the car's front seat by peering through the car window when it was parked in a driveway.

To find the plain-view exception's other two elements satisfied requires us to apply a burden-shifting provision applicable to Michigan's concealed weapon statute, and then yet another exception to the warrant requirement. First, while pistols are not always illegal to carry in a car in Michigan, they are, in effect, presumptively so. Michigan citizens are free to carry pistols in their car so long as they have a license to do so; but Michigan Compiled Law 776.20 places the burden of establishing that license on the owner, lest they be found guilty of violating Michigan's concealed weapon statute, Michigan Compiled Law 750.227, which applies to all pistols in vehicles, "concealed or otherwise." As the Supreme Court of Michigan has held, "upon a showing that a defendant has carried a pistol in a vehicle operated or occupied by him, prima facie case of violation of the statute has been made out." *People v. Henderson*, 218 N.W.2d 2, 4 (Mich. 1974); *see also People v. Perkins*, 703 N.W.2d 448, 455 (Mich. 2005) (reaffirming *Henderson*'s holding). Where the police have a "prima facie case" concerning the violation of the statute when they see a pistol in a car, we cannot say that the criminality of a pistol seen in a car is not "immediately apparent" (at least, until the owner satisfies his burden), and so the second element of the plain-view exception is satisfied.

But here, the car was locked, and the defendant apparently would not give up his keys, and so the police's right of lawful access to the pistol — the third element of the plain-view exception — might at first blush seem lacking. But, again, another exception to the warrant requirement applies: the automobile exception. This relatively long-established exception allows the police warrantlessly to search a car where they have probable cause to believe it contains evidence of a crime. *Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999) (citing *Carroll v. United States*, 267 U.S. 132, 153 (1925)). As the court's opinion correctly notes, our Circuit specifically has extended this exception to allow the police to break into parked cars when they have reason to suspect they contain contraband. *See, e.g.*, *United States v. Weatherspoon*, 82 F.3d 697, 697-99 (6th Cir. 1996).

And so the police were entitled in this case to use a wrecker to force open the defendant's car and seize the pistol without getting a warrant first. The pistol was apparently visible from outside the car, Michigan law effectively presumes that guns in cars are illegal, and the police may break into a car when they have probable cause to believe it contains something illegal inside. This is so even though the original rationales for each of the critical provisions commanding the result in this case are not present here. The plain-view exception is based on the "practical justification . . . [of] sparing police . . . the inconvenience and the risk — to themselves or to the preservation of the evidence — of going to obtain a warrant." *Arizona v. Hicks*, 480 U.S. 321, 327 (1987). But this pistol posed neither risk; it was locked in a parked car, not likely to go anywhere and certainly not available to the defendant, who was already in custody by the time it was seized. The Michigan burden-shifting statute was apparently enacted as a legislative reversal of a Michigan Court of Appeals case that held a defendant's lack of a license to be an element of the concealed weapon offense that must be proven by the prosecution in its case-in-chief. *Compare People v. Schrader*, 159 N.W.2d 147, 150 (Mich. Ct. App. 1968) (terming the absence of a license as "an essential element" of the concealed weapon charge and reversing a conviction where it was not sufficiently proven) *with Henderson*, 218 N.W.2d at 4 (reading the enactment of the burden-shifting statute as "an appropriate legislative expression that lack of a license is not an element of the offence" and reversing the holding of *Schrader*). But the case that apparently incited this legislative reversal concerned the appropriate burdens of proof *at trial*, and had nothing to do with searches; the burden-shifting statute's interaction with the plain-view and automobile exceptions to the warrant requirement — which drives the result in this case — appears to be as coincidental as it is unavoidable. And, finally, while the automobile exception was originally justified on the basis of the exigency created by the mobility of vehicles, *Carroll v. United States*, 267 U.S. 132, 153 (1925), recent cases have abandoned this rationale entirely, and hold that no exigency showing at all is required for the exception to apply, *see, e.g.*, *Dyson*, 527 U.S. at 466. By the time we finish applying these three rules — each profoundly detached from the practical

considerations that originally inspired its creation — there is little left of the warrant requirement first announced in *Katz v. United States*, 389 U.S. 347, 357 (1967).

The court's opinion notes in a footnote that "in cases like this . . . the preferred course of action would be for officers to secure the car and obtain a warrant before forcing entry." This suggestion is laudatory, but it is, as should be obvious by now, utterly precatory: we may only request that the police comply with this "preferred" procedure, because the law is clear that they are under no legal obligation to do so. Make no mistake, the state of the law in Michigan is now that the police may break into and search a parked car whenever they see a pistol inside. This rule applies whether one is like the defendant in this case, a felon who had no right to possess a firearm and who will very likely spend years in prison on the basis of the fruit of one of these searches, or one is a duly licensed Michigan pistol owner, who happens to have one's gun infelicitiously positioned within a parked car when the police walk by, and fails to be present at that moment to rebut the law's presumption that the item is illegally possessed. In a total inversion of the *Katz* rule, these warrantless searches are now per se reasonable under the Fourth Amendment.

I agree with the decision of the Michigan Court of Appeals in *Schrader*, *supra*, that the absence of a license for a pistol should be an element of the offense, and therefore should be established before the police can be said to have probable cause to believe the law has been violated, but the legislature overruled this decision. Once that occurred, against the backdrop of the plain-view exception and the automobile exception, a police officer in Michigan may forego a warrant and break into a car.